PEOPLE v WEBB

Docket No. 104587. Argued April 9, 1998 (Calendar No. 1). Decided
     July 21, 1998. Rehearing denied 459 Mich 1204.

     Ronald D. Webb was charged in the Jackson Circuit Court with two
     counts of first-degree murder and two counts of possession of a
     firearm during the commission of a felony. The defendant offered
     the defense of insanity. The court, Chad C. Schmucker, J., entered
     judgment on a jury verdict, finding the defendant not guilty by rea-
     son of insanity of the murder of his father, guilty but mentally ill of
     the second-degree murder of his father's friend, and guilty of fel-
     ony-firearm. The defendant was sentenced to prison. The Court of
     Appeals, GRIBBS, P.J., and D. E. HOLBROOK, JR., and MARKMAN, JJ.,
     affirmed the convictions in an unpublished opinion per curiam,
     finding that the circuit court did not abuse its discretion in restrict-
     ing the testimony of the defendant's psychiatric expert, and
     remanded the case to determine whether the trial court erred in
     sending the defendant to prison to serve his sentences for murder
     and felony-firearm, rather than to the Center for Forensic Psychia-
     try for a psychiatric evaluation (Docket No. 154722). The defendant
     appeals.

     In an opinion by Chief Justice MALLETT, joined by Justices
     BRICKLEY, BOYLE, WEAVER, and TAYLOR, the Supreme Court held:

     Although the circuit court erred in limiting the expert's testi-
     mony, the error was harmless. A defendant who is acquitted of one
     offense by reason of insanity, but is convicted of another offense,
     is properly sentenced to the custody of the Department of Correc-
     tions, and, pursuant to MCL 768.36; MSA 28.1059, is to receive eval-
     uation and treatment of any mental illness.

     1. While appropriate limits may be placed on the testimony of a
     psychiatric expert, in this case, the trial court's rulings, had they
     been strictly complied with, would have improperly limited the tes-
     timony of the defendant's expert. The error, however, was harm-
     less; the expert was able to explain his views at length and was not
     effectively precluded from making his point. The jury's decision to
     find the defendant not guilty by reason of insanity with regard to
     the killing of his father, bespeaks the jury's full understanding of
     the expert's views.

2. Where a person simultaneously is acquitted by reason of insanity and convicted of other offenses, MCL 768.36(3); MSA 28.1059(3) governs over MCL 330.2050; MSA 14.800(1050), providing a prison term. While serving the term, the defendant is entitled to be evaluated and treated for his mental illness.

Vacated in part.

Justice CAVANAGH, joined by Justice KELLY, concurring in part and dissenting in part, stated that an evidentiary error is harmless only when it can be said that it is highly probable that it did not contribute to the verdict. In this case, it is highly probable that the restrictions placed on Dr. Watson's testimony contributed to the jury's seemingly inconsistent verdicts. Nothing in Dr. Watson's testimony supports finding the defendant insane at one instant, when he was shooting his father, but sane the next, when he was shooting Ms. Bateman. The logical inconsistency of the jury's verdicts tends to indicate that Dr. Watson was not able to bring out all the facts necessary for the jury to understand that he believed that the defendant was insane at the time he shot both victims.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *John McBain*, Prosecuting Attorney, *Richard D. Hitt*, Special Prosecutor, and *Jerrold Schrotenboer*, Chief Appellate Attorney, for the people.

State Appellate Defender (by *P. E. Bennett*) for the defendant.

MALLETT, C.J. This is a murder case in which the defendant offered the defense of insanity. Following his conviction on one murder count, the defendant argued in the Court of Appeals that the circuit court abused its discretion in restricting the testimony of his psychiatric expert. The Court of Appeals affirmed, finding no error. We believe that the circuit court did err, but we likewise affirm. On this record, the error was harmless.

We also modify the judgment of the Court of Appeals with regard to the nature of the sentencing procedure that should be followed when a defendant

is acquitted of one offense by reason of insanity, but is convicted of another offense. In such a situation, a defendant is properly sentenced to the custody of the Department of Corrections and shall receive evaluation and treatment of any mental illness pursuant to MCL 768.36; MSA 28.1059.

I

In November 1990, the defendant shot and killed his father and his father's friend. The shootings took place at the father's home, where the defendant also lived. A short time before, the father ordered the defendant, then nineteen years old, to move out of the house.

During the defendant's youth, the relationship between him and his father had been tumultuous. According to the defendant, his father was physically abusive and had a substantial drinking problem. Over the years, the defendant had engaged in a variety of aggressive and antisocial behaviors, some directed against his father and some directed against others. At one point, the defendant attempted to burn down his father's house.

After the shootings, the defendant made some efforts to conceal the crime; however, he was soon apprehended. He was charged with two counts of open murder and two counts of possession of a firearm during the commission of a felony. MCL 750.316, 750.227b; MSA 28.548, 28.424(2).

The defendant offered an insanity defense. His expert witness was Andrew S. Watson, M.D., a retired professor of law and of psychiatry.[1] The prosecution

---

[1] Dr. Watson passed away during the pendency of this appeal.

expert was William A. Decker, M.D., a former administrator of the Department of Mental Health's hospital in Kalamazoo.

Pursuant to MCL 768.20a(6); MSA 28.1043(1)(6),[2] each expert prepared and submitted a report. Dr. Watson's eight-page report and Dr. Decker's seven-page report, both typed single-spaced, began with a list of prior sources that each doctor examined. By title, and without summary of content, Dr. Watson listed thirty-seven various letters, reports, and other materials that he had reviewed before meeting the defendant. Dr. Decker listed thirty-nine such items, including Dr. Watson's report. Each doctor then described at length the information and the impressions garnered during an interview with the defendant. Dr. Watson's report concluded with these observations:

> As noted above, this [double homicide] was not deliberate and conscious activity, but was rather driven by unconscious forces over which he had no control. This lack of self-awareness, due to the factors outlined above, are the manifestations of mental illness required by law in an insanity pleading.

---

[2]    Upon conclusion of the examination, the center for forensic psychiatry or other qualified personnel, and any independent examiner, shall prepare a written report and shall submit the report to the prosecuting attorney and defense counsel. The report shall contain:

(a) The clinical findings of the center, the qualified personnel, or any independent examiner.

(b) The facts, in reasonable detail, upon which the findings were based.

(c) The opinion of the center or qualified personnel, and the independent examiner on the issue of the defendant's insanity at the time the alleged offense was committed and whether the defendant was mentally ill or mentally retarded at the time the alleged offense was committed. [MCL 768.20a(6); MSA 28.1043(1)(6), as amended by 1983 PA 42.]

For the reasons stated above, it is my opinion that 1) Ronnie Webb can appropriately plead not guilty by reason of insanity; or alternatively 2) that he may be found to lack the intent to commit first degree murder.

## Dr. Decker reached a different conclusion:

There was nothing in the information that I obtained from Mr. Ronald Webb personally, or in my observations of him during the course of my evaluation, or in the voluminous amount of material that I reviewed to indicate that Ronald David Webb at any time in the past or at the time of the commission of the crime with which he is charged on November 3, 1990, to indicate that he was mentally ill. Further, there was no evidence to indicate that he lacked the capacity to either appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. It is therefore my opinion that Mr. Ronald David Webb was not legally insane at the time of the commission of the crimes with which he is charged of having committed on November 3, 1990.

The defendant was tried in May 1992. After defense counsel offered his opening statement, the assistant prosecutor rose to object:

Your Honor, during opening statement counsel indicated that we would hear from Dr. Watson that the defendant was mentally ill. Dr. Watson filed a report here. In his report he comes to his conclusions, and his conclusions don't say he's mentally ill. Nowhere in here does Dr. Watson say that Ronnie Webb is mentally ill.

\*          \*          \*

Now, [defense counsel] is suggesting that his examiner is going to come in saying something other than what is contained in the report, which is required to list the mental illness or if he's mentally ill. He doesn't say anywhere in there that he was, in fact, mentally ill. I guess my motion is two parts, Judge: One is to strike the defense of insanity, strike

the witness, or limit the witness to the conclusions that he draws in his report as to mental illness.

* &ast; &ast;

[Defense counsel] now says that his examiner is going to—his independent examiner is going to say something other than the conclusions that he has drawn in his report, to-wit: That Ronnie Webb is mentally ill. What he says here is: This lack of self-awareness, due to the factors outlined above, are manifestations of mental illness. He doesn't say he's mentally ill or what the mental illness is.

* &ast; &ast;

Judge, I guess, other than that the statute requires that he lists that he's mentally ill; he doesn't do that. He doesn't say that he's insane in the report. It says that he's got to list sanity or insanity. What I presume what [defense counsel] is going to do is have Mr. Watson testify that Ronnie Webb was mentally ill and was insane at the time of the shooting. He doesn't say it in his report, Your Honor. I either want him stricken or limited to what he puts forth in his report in compliance with the statute.

The objection was discussed by the attorneys and by the judge, and the subject was treated again, at length, the following day. Defense counsel protested that "the prosecutor is trying to suggest to this court that the expert has to repeat in his report the words used by the legislature in the law, and that is not my understanding of the intent of the legislature." Defense counsel argued that Dr. Watson's report provided "exactly" what the statute required and responded, "How the prosecutor can suggest to the Court that that does not say that the man was mentally ill at the time is beyond me."

The circuit court refused to bar the defense of insanity or the testimony of Dr. Watson. The court

noted that, early in his report, Dr. Watson wrote that "[t]he purpose of this evaluation is to ascertain whether Ronnie Webb's capacity to understand and to conform his behavior to the requirements of the law . . . ." Given Dr. Watson's final conclusion that the defendant had exhibited "the manifestations of mental illness required by law in an insanity pleading," the circuit court evidently found that the report contained, with sufficient clarity, a finding of mental illness and insanity.[3]

The court then ruled:

> I'm not going to allow Dr. Watson to testify to any clinical findings that are not listed in his report. The statute requires that the report shall contain the facts in reasonable detail upon which the findings were based. I'm not going to allow him to testify to any facts, upon which the findings were based if they're not listed in his report.

When asked to clarify the ruling, the court added that Dr. Watson would not be permitted to testify on the basis of facts adduced by other witnesses during the trial.

Dr. Watson testified at length on behalf of the defendant. During the course of his testimony, he pushed the limits of the court's evidentiary ruling, prompting numerous objections from the assistant

---

[3] When these events arose, MCL 768.21a(1); MSA 28.1044(1)(1) provided that a person "is legally insane if, as a result of mental illness as defined in [MCL 330.1400a; MSA 14.800(400a)], that person lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." MCL 330.1400a; MSA 14.800(400a), as added by 1975 PA 179, defined mental illness as "a substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." For current language, see MCL 330.1400(g); MSA 14.800(400)(g).

prosecutor. In response, the circuit court several times reaffirmed its earlier ruling that Dr. Watson's testimony would be restricted to what was contained in his report. In these exchanges, the court indicated that Dr. Watson could not testify regarding the factual background supplied by the thirty-seven documents that he had reviewed and that were listed at the beginning of his report.

Despite the objections of the assistant prosecutor, and the trial court sustaining those objections, Dr. Watson was able to testify fully regarding this matter. A review of his wide-ranging testimony, spread across two days of trial and almost two hundred pages of transcript, reveals that he was able to present a full exposition of his views and of the facts and theories that were the bases for his conclusions. In short, Dr. Watson was a forceful witness who, notwithstanding the trial court's rulings, found ways to provide the jury with the information that he wished to share.

The jury returned its verdict on the tenth day of trial. With regard to the murder of his father, it found the defendant not guilty by reason of insanity. However, he was found guilty, but mentally ill, of second-degree murder in the shooting death of his father's friend. The jury also found the defendant guilty of two counts of possession of a firearm during the commission of a felony.

For the murder of his father's friend, the defendant was sentenced to serve twenty-five to fifty years in prison and an additional two years, to be served consecutively, for each of the felony-firearm convictions.

The Court of Appeals affirmed the defendant's convictions.[4] Among the claims rejected by the Court of Appeals was the defendant's assertion that the circuit court improperly limited the testimony of Dr. Watson.

The Court of Appeals granted partial relief with regard to the defendant's claim that the circuit court erred by sending him directly to prison (to serve his sentences for murder and felony-firearm) rather than first to the Center for Forensic Psychiatry (for a psychiatric evaluation following an acquittal by reason of insanity). In this respect, the Court of Appeals ordered a remand to circuit court for further proceedings. The defendant applied to this Court for leave to appeal on several issues. Because the prosecuting attorney did not file a timely answer, we issued an order directing him to show cause why relief should not be granted on two of the defendant's claims.[5]

After review of the parties' submissions, we granted leave to appeal, limited to whether "(1) the defendant's conviction should be reversed because the trial court limited the defense expert's testimony only to the information in his written report, and (2) whether the trial court erred by not referring the defendant to the Center for Forensic Psychiatry pursuant to MCL 330.2050; MSA 14.800(1050)."[6]

II

As a preliminary matter, we note that the primary goal of judicial interpretation of statutes is to ascer-

---

[4] Unpublished opinion per curiam, issued October 3, 1995 (Docket No. 154722).

[5] Unpublished order of the Supreme Court, entered September 17, 1996 (Docket No. 104587).

[6] 456 Mich 865 (1997).

tain and give effect to the intent of the Legislature. *People v Stanaway*, 446 Mich 643, 658; 521 NW2d 557 (1994). The rules governing statutory construction require that every word or phrase of a statute be given its commonly accepted meaning. *Western Michigan Univ Bd of Control v Michigan*, 455 Mich 531, 539; 565 NW2d 828 (1997); MCL 8.3a; MSA 2.212(1). In addition, when this Court construes two statutes that arguably relate to the same subject or share a common purpose, the statutes are in pari materia and must be read together as one law, even if they contain no reference to one another and were enacted on different dates. *Feld v Robert & Charles Beauty Salon*, 435 Mich 352, 359-360; 459 NW2d 279 (1990); *Crawford Co v Secretary of State*, 160 Mich App 88; 408 NW2d 112 (1987). The object of the in pari materia rule is to give effect to the legislative purpose as found in harmonious statutes. *Jennings v Southwood*, 446 Mich 125, 136-137; 521 NW2d 230 (1994). If statutes lend themselves to a construction that avoids conflict, then that construction should control. *House Speaker v State Administrative Bd*, 441 Mich 547, 568-569; 495 NW2d 539 (1993).

We must read both statutes " 'according to the plain language of each, giving effect to the meaning of the words as they ought to have been understood by those who adopted them.' " *McAuley v General Motors Corp*, 457 Mich 513, 518; 577 NW2d 100 (1998), quoting *Buscaino v Rhodes*, 385 Mich 474, 481; 189 NW2d 202 (1971). Finally, it is well established that the interpretation and application of statutes is a question of law that is reviewed de novo. *Cardinal Mooney High School v Michigan High*

*School Athletic Ass'n*, 437 Mich 75, 80; 467 NW2d 21 (1991).

III

MCL 768.20a(6); MSA 28.1043(1)(6) outlines the contents that must be found in the report of a testifying expert.[7] These requirements were satisfied by Dr. Watson's report, and the circuit court appropriately permitted him to testify.

With regard to the scope of the expert's testimony, the statute is silent. The Court of Appeals drew guidance from *People v Hayes*, 421 Mich 271; 364 NW2d 635 (1984), and *People v Dobben*, 440 Mich 679; 488 NW2d 726 (1992). In *Hayes*, this Court interpreted the statutory requirement that a defendant cooperate with a psychiatric examination or be barred from presenting any testimony regarding his mental state at trial.[8] We held that the statute did not violate the defendant's due process right to present a defense and noted the legislative purpose to "protect the integrity of the evidence regarding an insanity defense." 421 Mich 280.

In *Dobben*, the issue was whether each testifying expert would be allowed to rely on information generated during an earlier competency evaluation, or whether the statute[9] allowed only an "examining qualified clinician" to testify in reliance on such information. Dealing with that issue, which is not presented in this case, we held that such a testifying expert may "rely on historical data, including information and opinions contained in prior competency evaluations,

---

[7] See n 2.

[8] MCL 768.20a(4); MSA 28.1043(1)(4).

[9] MCL 330.2028(3); MSA 14.800(1028)(3).

when forming an opinion regarding a defendant's criminal responsibility." 440 Mich 698. We found that MCL 768.20a; MSA 28.1043(1) "do[es] not limit the information an independent expert may use as the basis of an opinion regarding criminal responsibility." *Id.*

In the present case, the Court of Appeals explained:

> Although the specific issue raised by defendant in this case is different from the issues addressed in *Dobben* or *Hayes,* we find the reasoning of those cases to be instructive. In this case, the essence of the trial court's ruling was that Dr. Watson's testimony must be in accordance with his findings in this written report. In light of the public policy reasons underlying MCL 768.20a; MSA 28.1043(1)—that is, to prevent surprise of opposing counsel and to protect the integrity, accuracy, and credibility of the evidence of insanity—we are confident that the trial court did not abuse its discretion in this case. Indeed, had the trial court allowed Dr. Watson to testify regarding facts, findings, or opinions not in his report, such a ruling would have been in direct contravention of [MCL 768.20a(6); MSA 28.1043(1)(6)]. The provisions of MCL 768.20a; MSA 28.1043(1) were intended to ensure that *both* parties and the court have a fair and accurate evaluation of the defendant's mental state. *Hayes, supra* at 280-281. Accordingly, we conclude that defendant is not entitled to relief on this basis. [Emphasis in original.]

In a footnote, the Court of Appeals added:

> Nonetheless, even assuming that the trial court erred in some manner, we would find that any error was harmless. See *People v Grant,* 445 Mich 535; 520 NW2d 123 (1994). Defendant failed to make an offer of proof to establish the substantive nature of the testimony excluded. MRE 103(a)(2). Moreover, notwithstanding the court's ruling, defendant's expert was able to testify extensively regarding his theories, his impressions of defendant, and his ultimate

opinion that defendant was both mentally ill and legally insane at the time of the killings; indeed, the expert's testimony spanned over 200 pages of transcript. See *People v Johnson*, 52 Mich App 560, 562; 218 NW2d 65 (1974); *People v Haney*, 86 Mich App 311, 317; 272 NW2d 640 (1978). Accordingly, defendant has failed to establish prejudicial error.

As the Court of Appeals noted, the statute does not provide clear direction with regard to the nature of the expert's testimony. However, the Michigan Rules of Evidence do offer guidance:

> Rule 703[10] Bases of Opinion Testimony by Experts
>
> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. The court may require that underlying facts or data essential to an opinion or inference be in evidence.
>
> Rule 705 Disclosure of Facts or Data Underlying Expert Opinion
>
> The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

In light of those provisions, and in light of the clear legislative purpose, as explained in *Hayes*, to protect the integrity of the decisional process, it is clear that appropriate limits can be placed on the testimony of a psychiatric expert. However, the circuit court in this case misplaced those limits.

---

[10] This is the current language, reflecting amendments that recast the rules in gender-neutral phrasing. 448 Mich cxxvi, cxxxi-cxxxii (1995). Otherwise, the language is the same as it was when these events occurred.

We explained in *Dobben* that "there is simply noth-
ing in the language of [MCL 330.2028(3); MSA
14.800(1028)(3)], or its historical context, indicating a
legislative purpose to preclude an independent exam-
iner from relying on historical data as a basis for his
opinion." 440 Mich 693. Since MRE 703 allows an
expert to offer an opinion on the basis of facts made
known to the expert before the hearing, or perceived
by the expert at the hearing, we conclude that the
trial court's rulings, had they been strictly complied
with, would have improperly limited Dr. Watson's
testimony.

As is clear from *Hayes* and *Dobben*, the purpose of
these statutory provisions is to assure that the pros-
ecution and the defense have fair notice of, and full
access to, a common body of background informa-
tion. In the present case, both the prosecution and
defense experts listed, with specificity, exactly what
materials they had reviewed before interviewing the
defendant. There is no indication that these docu-
ments were not sufficiently identified, or that they
were unavailable. In fact, the defendant provided the
prosecution with the documents referenced by Dr.
Watson well before trial. Because the rationale behind
MCL 768.20a(6); MSA 28.1043(1)(6) had been satis-
fied, i.e., notice to the opposing party was provided,
Dr. Watson should have been given the opportunity to
refer to the background materials listed in his report.

Similarly, the events that occurred at trial, includ-
ing the information adduced from the witnesses, is
plainly information that is readily available to both
sides. In no sense is the search for truth impeded by
allowing the prosecution or defense experts to take

cognizance of developments at trial. Indeed, MRE 703 specifically allows this testimony.

However, though the circuit court's rulings would have, if complied with, limited Dr. Watson's testimony, we find that the error was harmless. Despite the objections of the prosecutor and the trial court sustaining those objections, Dr. Watson provided full and detailed testimony in which he explained his views at length. Notably, the defendant has made no offer of proof regarding testimony that should have been admitted, and we have located no point in Dr. Watson's testimony where he was effectively precluded from making his point. Indeed, the jury's decision to find the defendant not guilty by reason of insanity, with regard to the killing of his father, bespeaks the jury's full understanding of Dr. Watson's views.

IV

As indicated, the defendant was found not guilty of the murder of his father, by reason of insanity. However, he was convicted (though found mentally ill) of the second-degree murder of his father's friend, and of felony-firearm. For the murder, he was sentenced to prison for twenty-five to fifty years, to run consecutively to his two-year sentences for the felony-firearm conviction. The circuit court's order was labeled a "Judgment of Sentence" and "Commitment to Corrections Department." The defendant was sent to prison, where he now resides.

The defendant believes that he should have been sent first to the Center for Forensic Psychiatry, rather than being sent directly to prison. He relies on MCL 330.2050(1); MSA 14.800(1050)(1), which begins:

> The court *shall* immediately commit any person who is acquitted of a criminal charge by reason of insanity to the custody of the center for forensic psychiatry, for a period not to exceed 60 days. [Emphasis added.]

The remainder of the statute provides that the commitment is for the purpose of examining and evaluating the person's present mental condition. Depending on the results, the person may be released or, following additional judicial proceedings, retained for treatment. Defendant interprets this language as providing no discretion in the trial court. This interpretation of the word "shall" in MCL 330.2050; MSA 14.800(1050), while correct in a situation where this is the only sentencing provision applicable, is misguided under the facts of this case, where more than one statute applies to the defendant's sentence.

The Court of Appeals agreed with the defendant that, as a person acquitted by reason of insanity, his sentence was governed by this statutory provision:

> Although the automatic commitment statute does not expressly address this situation, we conclude that its purpose is not vitiated by the fact that defendant was also found criminally responsible for separate offenses. Defendant was entitled to commitment for evaluation of his then present mental condition before commitment to the Department of Corrections to serve his prison sentences. See *People v McQuillan*, 392 Mich 511; 221 NW2d 569 (1974).
>
> Nonetheless, defendant's GBMI conviction for killing [his father's friend] required that he "undergo further evaluation and be given such treatment as is psychiatrically indicated . . . ." MCL 768.36(3); MSA 28.1059(3). From the record available, we are unable to discern whether defendant's mental condition has been evaluated since incarceration. Accordingly, we remand to the trial court for a determination of this issue, and, unless otherwise moot, the trial court is directed to comply with the provisions of MCL

330.2050; MSA 14.800(1050). See *People v Murphy*, 416 Mich
453, 468; 331 NW2d 152 (1982).

Unsatisfied with that relief, the defendant asks this
Court to review the matter. We hold that the Court of
Appeals erred by remanding this case to the circuit
court. The defendant's commitment to the Depart-
ment of Corrections, rather than to the Center for
Forensic Psychiatry, was proper.

A reading of the full text of MCL 330.2050; MSA
14.800(1050) leaves no doubt that it is a measure to
promote public safety. Persons acquitted by reason of
insanity, particularly where the facts are grave, can-
not be allowed simply to walk out the front door of
the courthouse. The statute is clearly designed to
establish a procedure by which it can be determined
whether the person can safely reenter society.

For example, in *People v McQuillan, supra* at 525-
529, a case relied on by the Court of Appeals, this
Court dealt with a prior version of the statute. There,
we observed that "past criminal conduct caused by
insanity justifies temporary detention for examina-
tion," *id.* at 527, and indicated that "protection of
society" was one of the elements to be balanced in
determining the disposition of a person acquitted by
reason of insanity, *id.* at 528-529. Plainly, MCL
330.2050; MSA 14.800(1050) establishes a procedure
for determining whether a person acquitted by reason
of insanity can safely be returned to society.[11]

---

[11] Obviously, a diagnostic commitment at the scheduled point of release
would be essential if a person were convicted of a minor offense and
given a short term of incarceration, and also acquitted of a major offense
by reason of insanity.

However, that is an idle inquiry, and surely beyond the intent of the Legislature, where a person is simultaneously convicted of other offenses and sentenced to long terms of imprisonment. Indeed, MCL 330.2050; MSA 14.800(1050) was the only statute relevant to the defendant's situation in *McQuillan*, unlike the present case, where several statutes relate to defendant's sentence.[12]

As noted above, defendant urges this Court to send him to the Center for Forensic Psychiatry, which he alleges is the only place he can be confined pursuant to the language of MCL 330.2050; MSA 14.800(1050). This argument must fail, however, because MCL 768.36(3); MSA 28.1059(3) properly addresses this situation:

> If a defendant is found guilty but mentally ill . . . *the court shall impose any sentence which could be imposed pursuant to law upon a defendant who is convicted of the same offense. If the defendant is committed to the custody of the department of corrections, he shall undergo further evaluation and be given such treatment as is psychiatrically indicated for his mental illness or retardation.* Treatment may be provided by the department of corrections or by the department of mental health after his transfer pursuant to sections 1000 or 1002 of Act No. 258 of the Public Acts of 1974, being sections 330.2000 or 330.2002 of the Michigan Compiled Laws. [Emphasis added.]

The language of subsection 3, like the language of MCL 330.2050; MSA 14.800(1050), is mandatory: The trial judge must sentence defendant to a prison term in the Department of Corrections. Furthermore, the language of subsection 3 also provides that the

---

[12] MCL 330.2050; MSA 14.800(1050); MCL 768.36; MSA 28.1059; MCL 750.227b; MSA 28.424(2).

defendant may receive evaluation and treatment for a mental illness through the Department of Corrections. On the basis of the plain language of MCL 768.36(3); MSA 28.1059(3), and in our effort to read statutes in pari materia together as one law, we conclude that the Legislature intended it to govern over MCL 330.2050; MSA 14.800(1050) in a factual scenario such as the present case.

Here, the defendant is properly committed to the Department of Corrections for a term of twenty-five to fifty years in prison, plus two more years for felony-firearm. In this situation, for the reasons noted above, we are confident that the Legislature did not intend that the defendant be sent on a pointless detour through the Center for Forensic Psychiatry.

We do note, however, that MCL 768.36(3); MSA 28.1059(3) entitles the defendant to be evaluated and treated for his mental illness while in the corrections system. The Court of Appeals ordered that the trial court evaluate whether the Department of Corrections had complied with this statute. We affirm the trial court's sentence, and vacate that portion of the Court of Appeals decision pertaining to MCL 768.36; MSA 28.1059 without prejudice to the defendant's right to seek appropriate relief against the Department of Corrections to enforce the statute.

V

For these reasons, we affirm the judgment of the trial court and vacate the Court of Appeals decision in part without prejudice to defendant's right to seek relief against the Department of Corrections.

BRICKLEY, BOYLE, WEAVER, and TAYLOR, JJ., concurred with MALLETT, C.J.

Cavanagh, J. *(concurring in part and dissenting in part)*. I agree with the majority's conclusion that the trial court erroneously restricted the scope of Dr. Watson's testimony. However, I do not share its sentiment that this error was harmless. Therefore, I respectfully dissent from that portion of the opinion.

This Court recently adopted the "highly probable" standard for analyzing the harmlessness of nonconstitutional error. *People v Gearns*, 457 Mich 170, 203; 577 NW2d 422 (1998). Thus, an error is harmless only when it can be said that it is "highly probable that the [evidentiary error] did not contribute to the verdict . . . ." *Id.* at 205. While it does not reference the highly probable standard, the majority apparently believes that the evidentiary error did not contribute to the verdicts in this case. It devotes the following paragraph to the harmless error analysis:

> However, though the circuit court's rulings would have, if complied with, limited Dr. Watson's testimony, we find that the error was harmless. Despite the objections of the prosecutor and the trial court sustaining those objections, Dr. Watson provided full and detailed testimony in which he explained his views at length. Notably, the defendant has made no offer of proof regarding testimony that should have been admitted, and we have located no point in Dr. Watson's testimony where he was effectively precluded from making his point. Indeed, the jury's decision to find the defendant not guilty by reason of insanity, with regard to the killing of his father, bespeaks the jury's full understanding of Dr. Watson's views. [*Ante* at 279.]

I do not share the majority's certainty on this issue. Indeed, I believe a review of the record in this case does not support its conclusion.

The strongest evidence of the effect of the restrictions placed on Dr. Watson lies in the two different

verdicts with respect to the two different victims in this case. I cannot agree with the majority that the jury's verdict of not guilty by reason of insanity with regard to the killing of defendant's father truly "bespeaks the jury's full understanding of Dr. Watson's views." *Id.* Defendant was found both guilty and not guilty of two murders that took place simultaneously. Nothing in Dr. Watson's testimony supports finding defendant insane at one instant, when he was shooting at his father, but sane the next, when he was shooting at Ms. Bateman.[1] Rather, Dr. Watson's diagnosis was that defendant was insane at the time of both murders. The logical inconsistency of the jury's verdicts tends to indicate that Dr. Watson was not able to bring out all the facts necessary for the jury to understand that he believed the defendant was insane at the time he shot both victims.

In particular, Dr. Watson was prevented from testifying about the contents of the items he reviewed in making his diagnosis, from testifying about any diagnosis contained in any of the items attached to his report, from discussing certain aspects of the defend-

---

[1] In fact, defendant's testimony at trial indicates that he never actually aimed the gun to specifically hit either one of the victims:

*Q.* Did you aim the gun before you fired it?

*A.* I held the gun up and started shooting.

*Q.* Did you shoot your dad and Susan and then wait and shoot them again?

*A.* It was all one right after another. I fired the shots one right after another.

Unfortunately, Dr. Watson was not able to testify about this or any other testimony occurring at trial because such testimony was not contained within his written report. The only time he attempted to refer to defendant's testimony during trial, his answer was subject to an immediate objection by the prosecutor.

ant's familial relations, and from connecting his opinions to the other testimony produced at trial. Such testimony is crucial to the factfinder's ability to evaluate an expert's opinions and diagnosis. As Justice BOYLE explained in *People v Dobben*, 440 Mich 679, 697; 488 NW2d 726 (1992):

> Uncovering the facts and circumstances on which an expert's opinion is based is essential to enable other experts to determine whether the opinions expressed by the witness are correct, and to contradict them if wrong. *Most importantly, without examination of the foundation of the opinion, the factfinders' evaluation of the relative value of the opinions offered is necessarily circumscribed and the reliability of its ultimate determination correspondingly compromised.*
>
> *Simply stated, the "probative value of an opinion of sanity depends on the facts upon which it is based."* [Quoting *People v Murphy*, 416 Mich 453, 465; 331 NW2d 152 (1982) (emphasis added).]

Dr. Watson expressed similar sentiment during a colloquy following one of the prosecutor's objections to his testimony:

> Now, if we could not use [the background material referenced in the report] to explore as launching points, to explore his proposition and find out what his behavior means, we might as well fold up our basket and go home.

>                    *       *       *

> And as I say, I don't mind being challenged whether or not I read this right; that's legitimate enough. I've got all the documents here that I used. They are the clinical material that I used in addition to my interview. *And to me it would be impossible to do an adequate communication to the jury so they can decide whether they want to believe me or whoever if I don't allude to these kinds of materials. I would be forced to say I believe so and so, take it or leave*

*it. I think that's the absolute anathema on all these kinds of explorations. And, in fact, that they can follow what we do and how we do it, then they can make a reasonable decision [about] which expert they want to believe. That's the only way that experts can be tested for whether you want to believe them or not, in my opinion. I can't see how we cannot do that.* [Emphasis added.]

For all these reasons, I am unable to conclude that it is "highly probable" that the restrictions placed on Dr. Watson's testimony did not contribute to the jury's seemingly inconsistent verdicts. Rather, I believe that it is highly probable that the error in this case *did* contribute to the verdicts. Thus, I would reverse the defendant's conviction and remand the case for a new trial.

KELLY, J., concurred with CAVANAGH, J.