*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ALEXAN ARMEN KORKIGIAN,

Defendant-Appellant.

FOR PUBLICATION
October 29, 2020
9:10 a.m.

No. 352444
Oakland Circuit Court
LC No. 2019-271470-FH

Before: LETICA, P.J., and FORT HOOD and GLEICHER, JJ.

PER CURIAM.

The district court bound Alexan Korkigian over for trial on one count of manufacturing a controlled substance (marijuana) in violation of MCL 333.7401(2)(d)(*iii*). Korkigian filed a circuit court motion to dismiss the charge, or in the alternative to raise a personal-use affirmative defense at trial. The circuit court denied both motions. We affirm.

## I. BACKGROUND

On November 20, 2018, an explosion leveled Korkigian's garage. At the time, Korkigian was using a process called butane extraction or open blasting to distill tetrahydrocannabinol (THC) from marijuana plant material. As a result of this conduct, the district court bound Korkigian over for trial on one count of manufacturing a controlled substance in violation of MCL 333.7401(2)(d)(*iii*). The statute provides:

(1) Except as authorized by this article, a person shall not manufacture, create, deliver, or possess with intent to manufacture, create, or deliver a controlled substance . . . .

(2) A person who violates this section as to:

* * *

(d) Marihuana, a mixture containing marihuana, or a substance listed in section 7212(1)(d) is guilty of a felony punishable as follows:

-1-

\* \* \*

(*iii*) If the amount is less than 5 kilograms or fewer than 20 plants, by imprisonment for not more than 4 years or a fine of not more than $20,000.00, or both.

"Manufacture" is defined elsewhere in the Public Health Code. MCL 333.7106(3)(a) provides:

"Manufacture" means the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis. It includes the packaging or repackaging of the substance or labeling or relabeling of its container, except that *it does not include . . . the following:*

(a) The *preparation or compounding* of a controlled substance by an individual *for his or her own use.* [Emphasis added.]

Marijuana is defined under the code as

all parts of the plant Cannabis sativa L., growing or not; the seeds of that plant; *the resin extracted from any part of the plant*; and *every compound, manufacture, salt, derivative, mixture, or preparation of the plant or its seeds or resin*. Marihuana does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks, except the resin extracted from those stalks, fiber, oil, or cake, or any sterilized seed of the plant that is incapable of germination. [MCL 333.7106(4) (emphasis added).]

In the circuit court, Korkigian contended that he could not be charged with or convicted of manufacturing of marijuana because the definition of manufacture excludes preparing or compounding marijuana for personal use. He filed a motion to either dismiss the charge against him or to bring a personal-use affirmative defense at trial.

The circuit court conducted an evidentiary hearing on Korkigian's motion. Korkigian presented an expert to explain how his actions amounted to conduct excepted from the definition of manufacturing marijuana. Alex Goodnough, a chemist at Precision Extraction Solutions, testified that there are two phases to open blasting—primary extraction and postprocessing extraction. During primary extraction, the user places marijuana plant material inside a glass tube. The user adds a solvent, such as butane, to dissolve the resin from the plant. The resin and the butane form a solution. The formation of the solution is not a chemical reaction, Goodnough asserted. Using a filter, such as a coffee filter, the user separates the butane/resin solution from the plant material. The butane/resin solution is then left in the open air to allow the butane to evaporate into the atmosphere. It was likely at this point of the process that the explosion occurred in Korkigian's garage. If the solution is left in an area without adequate ventilation, flammable butane gas can build up and a small spark can trigger an explosion.

Had the explosion not occurred, the solution in Korkigian's garage would have distilled down to the resin extract. This begins the postprocessing phase. The resin is then dissolved in "a polar solvent like ethanol" so fat molecules can be separated and filtered out. The ethanol is removed by heating the material to over 100 degrees Celsius. This "pop[s] . . . off" tetrahydrocannabinol acid (THCA), a nonpsychoactive agent, and converts it into THC, the psychoactive element in marijuana. This final conversion can be achieved as simply as heating THCA in the oven (while baking edibles) or using a lighter to smoke marijuana products. The conversion from THCA to THC is a chemical reaction, according to Goodnough.

Goodnough ultimately opined that the process used by Korkigian in this case involved the "preparation" of marijuana. Korkigian was "isolat[ing] the cannabinoids away from [the] carbon" in the marijuana plant to increase the concentration of THC and make smoking healthier. After reviewing the statutory definition of marijuana, the expert testified that both the primary extraction material and final product were "marijuana."

In his motion to dismiss, Korkigian emphasized that a person preparing or compounding marijuana for personal use is exempted from the statutory manufacturing prohibition. Korkigian relied on *People v Baham*, 321 Mich App 228, 240; 909 NW2d 836 (2017), in which this Court held that the personal-use exemption "only applies to a controlled substance already in existence, and it does not encompass the creation of a new controlled substance." This language avoids imposing criminal liability on a person who already possesses the controlled substance and is merely readying it for his or her own use. Korkigian asserted that he did not create a new controlled substance. Rather, he possessed marijuana and was in the process of preparing THC, which is also marijuana, according to precedent of both this Court and the Supreme Court.

Korkigian further contended that his act of extracting THC from marijuana plant material merely separated the THC from the plant material and was actually a less involved process than making marijuana brownies, which this Court placed within the personal-use exception in *Baham*. He maintained that rendering THC from the plant material did not involve a chemical reaction, which he claimed was required for manufacturing. In this regard, Korkigian relied on *People v Hunter*, 201 Mich App 671, 676-677; 506 NW2d 611 (1993), in which this Court held that the process of converting powder cocaine into crack cocaine requires a chemical alteration of the substance amounting to manufacture.

Korkigian additionally argued that the Public Health Code is unconstitutionally vague as applied to him. Specifically, Korkigian complained that the code does not "sufficiently" define "marijuana," "marijuana resin," "manufacture," or the activities that constitute manufacturing— "preparation" and "compounding."

The prosecution replied that the personal-use exemption does not broadly apply to any and all activities readying marijuana for personal use. Rather, the statute exempts only preparation and compounding, but not production, propagation, conversion, or processing. In this case, the prosecutor argued, Korkigian's activities went beyond preparation and compounding. Preparation and compounding of marijuana involve simple activities, like rolling a joint or making "special" brownies. But more complex activities, like converting powder cocaine into crack cocaine or "cooking" methamphetamines, are manufacturing acts outside the scope of the personal-use

exemption.  The open blasting used in this case was more akin to the second category, in the prosecutor's estimation.

The circuit court denied Korkigian's motion to dismiss the charges and the alternative motion to raise a personal-use defense at trial.  The court agreed that Korkigian's extraction process both began and ended with the same substance—marijuana.  But the court concluded that Korkigian nevertheless engaged in "manufacturing" because the marijuana changed its form as a result of Korkigian's manipulation.  And Korkigian "engaged in a significantly higher degree of activity involving the controlled substance beyond merely preparing or compounding it for use." Rather, Korkigian's open-blasting operation constituted "conversion" or "processing" under the statute, precluding dismissal of the charge or reliance on the personal-use affirmative defense.  The court further rejected Korkigian's constitutional challenge as this Court had previously interpreted the relevant statute with ease.

## II. ANALYSIS

We review for an abuse of discretion a trial court's denial of a motion to dismiss charges against a criminal defendant.  *People v Morrison*, 328 Mich App 647, 650; 939 NW2d 728 (2019). "An abuse of discretion occurs when the trial court's decision falls outside the range of principled outcomes."  *Id*. (cleaned up).[1]  We review de novo the lower court's determination "[w]hether a defendant's conduct falls within the scope of a penal statute."  *Id*. (cleaned up).  We also review de novo the availability of affirmative defenses for a statutory crime.  *People v Dupree*, 486 Mich 693, 702; 788 NW2d 399 (2010).

At its core, this case is about the proper interpretation and application of controlled-substance statutes.

> The primary goal in interpreting the meaning of a statute is to ascertain and give effect to the intent of the Legislature.  The first step in determining legislative intent is consideration of the statutory language itself.  Statutory language must be read in the context of the act as a whole, giving every word its plain and ordinary meaning.  When the language is clear and unambiguous, we enforce the statute as written.  [*People v Kowalski*, 489 Mich 488, 497-498; 803 NW2d 200 (2011) (cleaned up).]

## A. MOTION TO DISMISS

Korkigian argues that the charge against him is legally unsupportable and must be dismissed.  Extracting THC from marijuana plant material constitutes the preparation or compounding of marijuana under MCL 333.7106(3)(a), Korkigian insists, and therefore falls within the personal-use exemption.  The prosecution does not dispute that Korkigian intended to

---

[1] This opinion uses the parenthetical "cleaned up" to improve readability without altering the substance of the quotation.  The parenthetical indicates that nonsubstantive clutter such as brackets, alterations, internal quotation marks, and unimportant citations have been omitted from the quotation.  See Metzler, *Cleaning Up Quotations*, 18 J App Pract & Process 143 (2017).

manufacture marijuana for his own use. Rather, the prosecution contends that Korkigian's actions were not equivalent to the simple preparation or compounding of marijuana, but required a high degree of activity going well beyond that shielded by the personal-use exemption.

> As a reminder,

> "Manufacture" means the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis . . . except that it does not include  . . . :

> (a) The preparation or compounding of a controlled substance by an individual for his or her own use.  [MCL 333.7106(3)(a).]

The term "manufacture" encompasses six forbidden activities: production, preparation, propagation, compounding, conversion, and processing.  But two of those activities—preparation and compounding—are permitted if the product is a controlled substance intended for personal use.  Accordingly, if a person engages in production, propagation, conversion, or processing, his or her actions do not fall within the exemption, even if the product is for personal use.  See *Baham*, 321 Mich App at 238-241.

> This Court defined "preparation" and "compounding" in *Baham*, 321 Mich App at 240:

> [T]he term "preparation" means "the action or process of making something ready for use. . . ."  *Merriam–Webster's Collegiate Dictionary* (11th ed).  Likewise, in pertinent part, "compounding" denotes the action or process of putting "together (parts) so as to form a whole," such as by combining ingredients.  *Merriam– Webster's Collegiate Dictionary* (2014 11th ed) (defining "compound" and "-ing").

The four terms exempted from the personal-use exemption require something more:

> In contrast to preparation and compounding, the other four methods of manufacturing controlled substances—i.e., production, propagation, conversion, and processing—contemplate a significantly higher degree of activity involving the controlled substance, and thus these manufacturing activities are felonies regardless of whether the controlled substance so manufactured was for personal use or for distribution. [*Baham*, 321 Mich App at 241 (cleaned up).]

Based on these definitions, this Court stated in *Baham*, 321 Mich App at 240, "the plain intent of the statutory personal use exception is to avoid imposing felony liability on individuals who, already in possession of a controlled substance, make it ready for their own use or combine it with other ingredients for use."  This Court then provided "[t]ypical examples of preparation or compounding" marijuana: "making marijuana ready for use by 'rolling marijuana into cigarettes for smoking' or combining marijuana with other ingredients to make it ready for use by 'making the so-called "Alice B. Toklas" brownies containing marijuana.' "  *Id*. at 241, quoting *Stone v State*, 348 Ark 661, 667; 74 SW3d 591 (2002).  This Court summarized, "In both instances, the

controlled substance already exists in finished form, and any further action is undertaken merely to enable use of the substance." *Baham*, 321 Mich App at 241.

To differentiate "preparation" and "compounding" from the more intensive forms of manufacturing, this Court explained in *Baham*, 321 Mich App at 241-243:

> While we do not attempt to provide an exhaustive account of the activities that constitute production, propagation, conversion, and processing, we note that "production" has been statutorily defined as "the manufacture, planting, cultivation, growing, or harvesting of a controlled substance." MCL 333.7109(6). In turn, "manufacture" means "to make" from materials. *Merriam-Webster's Dictionary* (11th ed). In comparison, as commonly understood, (1) "propagation" involves "the act or action of propagating," such as to "increase (as of a kind of organism) in numbers," (2) "conversion" is "the act of converting," and (3) "processing" refers to "a series of actions or operations conducing to an end" or "a continuous operation or treatment esp. in manufacture." *Merriam-Webster's Dictionary* (11th ed) (defining "process" and adding-ing). From these various definitions, courts have recognized that production, propagation, conversion, and processing encompass "planting, growing, cultivating or harvesting a controlled substance," creating a controlled substance "by any synthetic process or mixture of processes," as well as the *alteration or extraction of a controlled substance, such as "taking a controlled substance and, by any process or conversion, changing the form of the controlled substance or concentrating it." State v Childers*, 41 NC App 729, 732, 255 SE2d 654 (1979). See also [*Hunter*, 201 Mich App at 676-677].
>
> In view of these different methods of manufacturing, . . . we hold that one may not claim the personal-use exception for making or cooking methamphetamine. Making or cooking methamphetamine clearly involves the creation of methamphetamine, meaning that it constitutes production, propagation, conversion, or processing of methamphetamine as opposed to the mere "preparation or compounding" of existing methamphetamine for personal use. [Emphasis added.]

This Court also provided guidance in *Hunter*, 201 Mich App at 674, in which the defendant was convicted of manufacturing crack cocaine. The evidence included a jar of water in which the defendant was dissolving powder cocaine. An expert testified that "the cocaine was in the 'wet phase' stage of being manufactured into crack cocaine." *Id*. The expert

> further testified that powder cocaine is converted into crack cocaine by means of a chemical process in which the powder cocaine is mixed with sodium bicarbonate or ammonia hydroxide in a container of water and heated. The heating process chemically alters the composition of the powder cocaine and transforms it into free-base cocaine that is essentially one hundred percent pure cocaine. [*Id*. at 676-677.]

In this case, Korkigian's open-blasting operation started and ended with materials defined as marijuana under the Public Health Code. However, as noted below, this fact is not dispositive. After all, the defendant in *Hunter* both began and ended his manufacturing process with cocaine,

-6-

but was held accountable for manufacturing because of the intensity of the process and the nature of the change to the substance. Moreover, contrary to Korkigian's insistence, *Hunter* does not hold that a "chemical reaction" must change the form of the substance in order for liability to be found. Rather, this Court held that the defendant in *Hunter* manufactured cocaine within the meaning of the statute because he converted powder cocaine into crack cocaine through chemical synthesis. *Hunter*, 201 Mich App at 676-677. Chemical synthesis is only one way to manufacture a controlled substance under the statute. The manufacture of a controlled substance can also occur "directly or indirectly by extraction from substances of natural origin." MCL 333.7106(3).

And although Korkigian presented an expert opinion that his acts were mere preparation or compounding of marijuana, the evidence also supported that Korkigian's actions amounted to processing or conversion.

> [A] trial court, in considering a motion to dismiss . . ., must first decide if the evidence introduced at the time the motion was made, viewed in the light most favorable to the prosecution, is insufficient to justify a reasonable man in concluding that all the elements of the crime were established beyond a reasonable doubt. [*People v Wright*, 99 Mich App 801, 818; 298 NW2d 857 (1980).]

Even a cursory review of Goodnough's testimony supports that a jury could conclude that open blasting to distill concentrated THC from raw plant material involves a "significantly higher degree of activity" than rolling a marijuana cigarette or baking brownies. Goodnough explained that butane is used to dissolve the plant material to extract the plant's resin. Once the butane evaporates away from the resin, the maker adds ethanol to cool the resin, causing the fat molecules to congeal so they can be separated out. The remaining resin must be heated to convert THCA to THC, leaving the manufacturer with a concentrated, pure product. The evidence precludes dismissal of the charge against Korkigian.

## B. CONSTITUTIONALITY

Dismissal also was not warranted on constitutional grounds. We review de novo Korkigian's contention that the statutes involved in this case are unconstitutionally vague. *People v Knapp*, 244 Mich App 361, 374 n 4; 624 NW2d 227 (2001). We approach such challenges presuming the statute's constitutionality. *People v Vronko*, 228 Mich App 649, 652; 579 NW2d 138 (1998).

> A penal statute is unconstitutionally vague if (1) it does not provide fair notice of the conduct proscribed, (2) it confers on the trier of fact unstructured and unlimited discretion to determine whether an offense has been committed, or (3) its coverage is overbroad and impinges on First Amendment freedoms. [*People v Newton*, 257 Mich App 61, 66; 665 NW2d 504 (2003).]

Korkigian contends that the statute failed to provide him notice that extraction via butane is prohibited. "Fair or proper notice exists if the statute gives a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *People v Dillon*, 296 Mich App 506, 511; 822 NW2d 611 (2012). "For a statute to be sufficiently definite, its meaning must be fairly ascertainable by reference to judicial interpretations, the common law, dictionaries, treatises, or

the commonly accepted meanings of words." *People v Sands*, 261 Mich App 158, 161; 680 NW2d 500 (2004). "A court considers a vagueness challenge in light of the facts at issue." *Id*.

Contrary to Korkigian's challenge, the Public Health Code *does* sufficiently define "marijuana," "marijuana resin," "manufacture," and the activities that constitute "manufacturing," including the terms "preparation" and "compounding." "Marijuana" is statutorily defined under MCL 333.7106(4) as "all parts of the plant Cannabis sativa L., growing or not; the seeds of that plant; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant or its seeds or resin." MCL 333.7106(4). Moreover, the definition also explains which part of the stalk and seeds do not constitute marijuana. This definition put Korkigian on clear notice that the plant material he possessed and the resin he extracted were "marijuana," as was the THCA and THC Korkigian attempted to derive from the resin.

Moreover, MCL 333.7106(3)(a) comprehensively defines "manufacture." While the six activities encompassing "manufacture" are not separately defined in the statute, this does not render the statute unconstitutionally vague. Meaning can be gleaned from judicial interpretations and dictionaries. This Court defined the means of manufacture in *Baham*, giving special attention to the terms specifically challenged in this case—preparation and compounding. The *Baham* Court relied on dictionary definitions in describing the terms. Given the precedent of this Court and the plain language of the statutes at issue, there is no ground to invalidate the statutory scheme.

## C. AFFIRMATIVE DEFENSE

Korkigian asserts that absent dismissal of the charge, he is nevertheless entitled to raise an affirmative defense under the personal-use exception codified in MCL 333.7106(3)(a). Because the personal-use exemption is not an element of the manufacturing offense, the prosecution is not required to prove the absence of the personal-use exemption to levy a charge against a defendant. Rather, Korkigian bears the burden of proving the exemption as an affirmative defense. *Baham*, 321 Mich App at 244. To establish the affirmative defense, a defendant must "present some competent evidence of preparation or compounding for personal use." *Id*. at 244-245.

Relying on Goodnough's testimony, Korkigian claims that he was in the process of "the preparation or compounding" of his marijuana for personal use when the explosion occurred. Therefore, he reasons, he has satisfied his obligation to come forward with evidence of an affirmative defense and the personal-use exception applies to his conduct. Whether Korkigian's acts as described by Goodnough satisfy the criteria for "preparation or compounding for personal use" is a legal question of statutory interpretation, however, that we review de novo. *People v Webb*, 458 Mich 265, 274; 580 NW2d 884 (1998).

Even fully accepting Goodnough's testimony, the butane extraction process he described does not come within the meaning of either "compounding" or "preparation." In *Baham*, 321 Mich App at 240 (quotation marks and citation omitted), we defined "compounding" as "the action or process of putting together (parts) so as to form a whole, such as by combining ingredients." By way of example, the United States Supreme Court has described "compounding" as "a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient." *Thompson v Western States Med Ctr*, 535 US 357, 360-361;

122 S Ct 1497; 152 L Ed 2d 563 (2002). Korkigian was not "compounding" ingredients when he attempted to "blast" the concentrated THC from the marijuana plant. To the contrary, he was in the process of *extracting* resin from the plant material.

Nor was Korkigian "preparing" marijuana for personal use through the butane extraction technique. In *Baham*, 321 Mich App at 240 (quotation marks and citation omitted), the Court employed a dictionary definition of "preparation," proposing that the term embraces "the action or process of making something ready for use . . . ." As we noted above, the Court invoked two examples of preparation: rolling marijuana into cigarettes for smoking and combining marijuana with other ingredients to make "Alice B. Toklas" brownies. *Id*. at 241.[2] In a broad sense, Korkigian was making the marijuana "ready for use" as resin that could, in turn, be transformed into oil or butter. But in the context of this case, the *Baham* definition of "preparation" is inapt.

"Indiscriminate reliance on definitions found in dictionaries can often produce absurd results. Words are used in many senses and often have diametrically opposed meanings, depending upon the sense in which they are used." *Liebscher v Boothroyd*, 46 CCPA 701, 705; 258 F2d 948 (1958). The abbreviated definition of "preparation" applied in *Baham* embraces conduct that is also consistent with the additional actions described in the statute, particularly "production" and "processing." Reflexive adoption of that definition here elides the facts underlying this case and a necessary contextual analysis.

Korkigian likens his acts to making a cup of tea or brewing a pot of coffee, which he characterizes as equivalent to the mere "preparation" of those beverages, making their raw ingredients "ready for use." Preparing coffee or tea involves pouring hot water over an organic substance, a two-step process blending two readily available components. "Open blasting," however, is far from a simple, routine, safe act. The butane extraction method makes marijuana "ready for use" through multiple steps, none of which are easy or uncomplicated. We reject the notion that the open-blasting technique merely "makes ready" marijuana plant material for personal use.

Moreover, an overly generous interpretation of "preparation" in the context of this case would conflict with the surrounding words and their meanings. We must assume that the words chosen by the Legislature and placed in MCL 333.7106(3) have different connotations and are not synonymous or interchangeable. *Pohutski v Allen Park*, 465 Mich 675, 684; 641 NW2d 219 (2002). To qualify as "preparation" for personal use, Korkigian's acts must diverge from those "manufacturing" efforts specifically prohibited by the statute: production, propagation, conversion, and processing. And in interpreting those words, we are further guided by the rule that we "must give effect to every word, phrase, and clause in a statute, and must avoid an interpretation that would render any part of the statute surplusage or nugatory." *Koontz v Ameritech Services, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002).

---

[2] Alice B. Toklas's brownie recipe required "pulveris[ing]" a "bunch of cannabis sativa." That simple act is a far cry from the butane extraction process. See <https://lithub.com/here-it-is-alice-b-toklass-recipe-for-hash-brownies/> and <https://blogs.scientificamerican.com/food-matters/go-ask-alice-the-history-of-toklas-8217-legendary-hashish-fudge/> (accessed October 21, 2020).

The "open blasting" process of transforming raw marijuana into useable resin involves more than just "preparing" the marijuana for personal use. Goodnough described the technique as incorporating the use of a volatile chemical (butane), combined with filtration, followed by evaporation of the solvent, dissolving of the product in a polar solvent, additional filtration, and heating the resulting material under a vacuum. This process is more appropriately characterized as "production" or "processing." While Korkigian is correct that in one sense he was engaged in "preparing" the marijuana for his own use, he was doing so by processing it in several different ways to arrive at an end product. Were we to hold that Korkigian's manufacturing activity was merely "preparation" because that word, too, fits his actions, the "preparation" aspect of the personal-use exception would swallow the prohibited conduct described in the rule. Thus, the circuit court did not err in concluding that as a matter of law, the affirmative defense of personal use is unavailable to Korkigian.[3]

We affirm.

/s/ Anica Letica
/s/ Karen M. Fort Hood
/s/ Elizabeth L. Gleicher

---

[3] As a final aside we note that the Michigan Medical Marihuana Act, MCL 333.26421 *et seq*., specifically prohibits open blasting. The act does not permit a person to "[s]eparate plant resin from a marihuana plant by butane extraction in any public place or motor vehicle, or inside or within the curtilage of any residential structure," or "in a manner that demonstrates a failure to exercise reasonable care or reckless disregard for the safety of others." MCL 333.26427(6)-(7). Neither does the subsequent initiative legalizing marijuana under state and local law for adults over 21. See MCL 333.27954(d) ("This act does not authorize . . . separation of plant resin by butane extraction . . . in any public place, motor vehicle, or within the curtilage of any residential structure . . . .").