PEOPLE v MURPHY

Docket No. 66041. Argued May 12, 1982 (Calendar No. 5).—Decided
    December 23, 1982. Rehearing denied 417 Mich 1113.

Gary T. Murphy was found by a jury in the St. Clair Circuit
    Court, Ernest F. Oppliger, J., to be guilty but mentally ill of
    first-degree criminal sexual conduct and of breaking and enter-
    ing. The Court of Appeals, R. M. Maher, P.J., and Bronson and
    Quinn, JJ., reversed and remanded for entry of a judgment of
    not guilty by reason of insanity and an order committing the
    defendant for psychiatric treatment (Docket No. 78-4489). The
    people appeal.

In an opinion by Justice Kavanagh, joined by Chief Justice
    Fitzgerald and Justices Williams, Levin, and Ryan, the Su-
    preme Court *held:*

The prosecution failed to present sufficient evidence to con-
    vince a rational trier of fact that the defendant was sane
    beyond a reasonable doubt at the time he committed the acts
    charged.

1. A defendant in a criminal proceeding is presumed sane.
    However, once any evidence of insanity is introduced, the
    prosecution bears the burden of proving the defendant's sanity
    beyond a reasonable doubt. The nature and quantum of evi-
    dence of sanity necessary to rebut evidence of insanity depends
    on the strength of the evidence of insanity. Merely some
    evidence of sanity may be sufficient to rebut some evidence of
    insanity, and yet wholly insufficient to rebut substantial evi-
    dence of insanity.

2. In this case, substantial evidence of the defendant's insan-
    ity at the time of the crimes was offered by experts for the
    defense and the prosecution. In addition, the defense offered lay
    testimony of the defendant's unusual behavior. A lay witness's
    observation of a defendant's abnormal acts has greater value as

REFERENCES FOR POINTS IN HEADNOTES

[1] 21 Am Jur 2d, Criminal Law §§ 74-77.
    Modern status of rules as to burden and sufficiency of proof of
    mental irresponsibility in criminal case. 17 ALR3d 146.
[2, 3] 21 Am Jur 2d, Criminal Law §§ 78-80.
[4] 21 Am Jur 2d, Criminal Law § 309.

evidence than testimony that the defendant was never observed by the witness to act abnormally unless the witness had prolonged and intimate contact with the defendant. Lay testimony may be competent to rebut expert testimony on the issue of sanity. The probative value of an opinion of sanity depends on the facts on which it is based. Against such a strong showing of insanity, the prosecution offered testimony by the police officers who arrested the defendant, who had only a brief opportunity to observe him, that he seemed normal. In order to send the case to the jury, the prosecution needed to present something more than such minimal evidence of sanity.

3. The Double Jeopardy Clause prohibits a second trial of a defendant once a reviewing court finds that the evidence offered at trial was insufficient to sustain the jury's verdict of guilty. Remand for entry of a judgment of not guilty by reason of insanity and an order committing the defendant for psychiatric treatment was proper.

Affirmed.

Justice Coleman wrote that she does not believe that the prosecutor should have the burden of proving the defendant's sanity beyond a reasonable doubt.

100 Mich App 413; 299 NW2d 51 (1980) affirmed.

1. CRIMINAL LAW — DEFENSES — INSANITY — PRESUMPTIONS — BURDEN OF PROOF.

A defendant in a criminal proceeding is presumed sane, but once any evidence of insanity is introduced the prosecution has the burden of proving the defendant's sanity beyond a reasonable doubt.

2. CRIMINAL LAW — DEFENSES — INSANITY — EVIDENCE — LAY TESTIMONY.

The probative value of an opinion of sanity depends on the facts on which it is based, and lay testimony may be competent to rebut expert testimony on the issue of sanity; a lay witness's observation of a defendant's abnormal acts has greater value as evidence than testimony that the defendant was never observed to act abnormally unless the witness asserting normal behavior had prolonged and intimate contact with the defendant.

3. CRIMINAL LAW — DEFENSES — INSANITY — EVIDENCE.

Testimony by police officers who arrested a defendant and had only a brief opportunity to observe him that the defendant seemed to act normally was insufficient to rebut substantial evidence of his insanity offered by expert witnesses for the defense and the prosecution and by lay witnesses.

4. CRIMINAL LAW — DOUBLE JEOPARDY.

   The Double Jeopardy Clause prohibits retrial of a defendant upon a finding by a reviewing court that the evidence offered at trial was insufficient to sustain the jury's verdict of guilty.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Robert H. Cleland,* Prosecuting Attorney, and *C. Denton Wolf,* Chief Appellate Attorney, for the people.

State Appellate Defender (by *Rolf E. Berg)* for the defendant.

Amicus Curiae:

*James L. Shonkwiler* for the Prosecuting Attorneys Association of Michigan.

KAVANAGH, J. A St. Clair Circuit Court jury found defendant guilty but mentally ill, MCL 768.36; MSA 28.1059, of criminal sexual conduct in the first degree, MCL 750.520b; MSA 28.788(2), and breaking and entering, MCL 750.110; MSA 28.305. He was sentenced to imprisonment of 20 to 40 years for the criminal sexual conduct conviction and 10 to 15 years for the other conviction.

The only issue disputed by the defendant was his sanity. In his opening statement to the jury, defense counsel conceded that defendant committed the acts alleged, but asked the jury to return a verdict of not guilty by reason of insanity. A motion *in limine* to submit only the issue of sanity to the jury and a motion for a directed verdict of not guilty by reason of insanity, made at the close of all the evidence, were both denied.

Defendant appealed to the Court of Appeals, arguing that, among other errors, the prosecution failed to present sufficient evidence of sanity. After finding inadmissible for lack of a proper foundation the testimony of police officers on the issue of

sanity, the Court decided, there being no other evidence of sanity, to reverse the defendant's convictions and remand for entry of judgment of not guilty by reason of insanity and an order committing defendant for psychiatric treatment pursuant to MCL 330.2050; MSA 14.800(1050). *People v Murphy,* 100 Mich App 413; 299 NW2d 51 (1980).

The people now appeal, arguing that the police officers' testimony was admissible, but that even without it, the Court of Appeals clearly erred in ruling that there was no evidence to support the findings of sanity. The defendant asks that we affirm the decision of the Court of Appeals.

We hold that, even with the police officers' testimony, the prosecution failed to present sufficient evidence to convince a rational trier of fact that the defendant was sane at the time he committed the acts alleged. The Court of Appeals decision is affirmed.

Our review of the evidence for sufficiency to support a jury verdict of sanity is governed by the standard announced in *Jackson v Virginia,* 443 US 307; 99 S Ct 2781; 61 L Ed 2d 560 (1979), and adopted in Michigan in *People v Hampton,* 407 Mich 354; 285 NW2d 284 (1979), *cert den sub nom Michigan v Hampton,* 449 US 885; 101 S Ct 239; 66 L Ed 2d 110 (1980). The relevant question is whether, after viewing all of the evidence in the light most favorable to the prosecutor, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson,* p 319. The former review for *any* evidence to support a jury verdict, on which the prosecutor appears to rest in this case, was discarded in *Jackson* and *Hampton* in favor of a review which gives meaning to the standard of proof beyond a reasonable doubt.

The jury's verdicts of guilty but mentally ill necessarily mean that the defendant was found sane at the time the offense was committed. The statute which authorizes the verdict of guilty but mentally ill requires that the trier of fact find "[t]hat the defendant was not legally insane at the time of the commission of that offense."[1] MCL 768.36(1)(c); MSA 28.1059(1)(c). Although found to be mentally ill, the defendant is held to be criminally responsible, *People v Booth,* 414 Mich 343, 354; 324 NW2d 741 (1982), that is, sane.

According to the testimony, defendant broke through the back door of the victim's second-floor apartment around 11:30 p.m. on November 20, 1977. The victim, having been awakened by the noise, was standing by the back door when defendant entered. She testified that he immediately struck her face and forced her to the floor while strangling her. Suddenly he stopped, then dragged the victim by her hair across the floor of the kitchen and into her bedroom. There, for the next two and one-half hours, defendant engaged in sexual intercourse with the victim and compelled her to submit to bizarre sexual acts. Throughout the incident, defendant beat her and called her insulting names. Defendant said he could kill her. At one point, defendant wanted her to kiss him. She testified that, disgusted by the blood on her face, defendant took her to the kitchen and gently

---

[1] Section 1 of the statute, in its entirety, reads:

"(1) If the defendant asserts a defense of insanity in compliance with section 20a, the defendant may be found 'guilty but mentally ill' if, after trial, the trier of fact finds all of the following beyond a reasonable doubt:

"(a) That the defendant is guilty of an offense.

"(b) That the defendant was mentally ill at the time of the commission of that offense.

"(c) That the defendant was not legally insane at the time of the commission of that offense."

washed away the blood. He then made her kiss him.

Ultimately, defendant fell asleep on the bed. The victim fled her apartment by the front door, locking it behind her, and found refuge in a neighbor's apartment. The police were called.

Police officers Davis and York arrived first. They kicked in the door to the victim's apartment. In the bedroom they found defendant asleep in bed, partially covered with a sheet. Pulling back the sheet, the officers saw defendant lying there naked except for the socks he wore. They first handcuffed defendant and then woke him. Defendant reacted like "someone coming out of a deep sleep, sound asleep," Officer Davis testified. Officer York agreed, saying that "when we woke him up he seemed to be like he had just woke up out of a real deep sleep. He just wasn't with it. He was sluggish." By then, two other police officers, Payne and Kornik, arrived and took defendant to the police station.

The victim and defendant's wife knew each other in high school and worked together after graduation in 1973. The victim's contact with defendant had always been brief and strictly incidental to her relationship with defendant's wife. She last saw defendant in 1973.

On the issue of insanity, defendant presented the testimony of his mother, mother-in-law, a chaplain and a psychiatrist. Defendant did not testify. Defendant's mother described an unusual childrearing. She testified that during her pregnancy with Gary, she suffered an extreme fear of death during childbirth. For the first three or four months after birth, Gary slept on his mother's breast. For three years thereafter, Gary slept most of the time with his parents. During this time, the mother testified, she fluctuated between extremes

of affection and rejection towards Gary. During periods of rejection, the mother stayed in bed and cried. At two years of age Gary prepared his own bottle. At three years, he prepared oatmeal and toast for himself. From the time Gary was four or five until his parents separated when he was ten years old, first one parent was out one night and the other the next. Between the ages of 11 and 15, Gary's mother testified, Gary stayed home alone in the evenings and made his own meals because his mother worked. From a young age until Gary was in his late teens, the mother testified, she was frequently nude around the house. Until Gary was 19, his mother occasionally lay down beside him and held him while he slept. When Gary was in his mid-teens, his mother testified, she "started playing the full mother role with my whole heart, I meant it. * * * I used to bake him gingerbread boys when he was eighteen or nineteen or twenty years old, the things he should have had when he was five."

Betty Haunstein, defendant's mother-in-law, described Gary, whom she saw weekly, as a good father to his two sons and as a good husband until about six months prior to the offense. She said her daughter and son-in-law were buying a home which Gary had extensively remodeled. He worked steadily at a building supply company in Port Huron. Mrs. Haunstein said she never knew Gary to be aggressive or violent. She said he was well-read and frequently discussed current events with her husband.

All of this began to change about six months prior to Gary's arrest, Mrs. Haunstein testified. She noticed a marked change in his behavior. She said he became sometimes withdrawn and sometimes intentionally aggravating. With a wild look,

his eyes shifted from side to side, and he did not look directly at people who spoke to him. He was impossible to please, said Mrs. Haunstein.

During the six-month period prior to Gary's arrest, his wife asked him to seek counseling. He went to Catholic Social Services, who referred him to a psychiatrist, but he never went.

The Reverend Father James Opferman, chaplain at the hospital where Gary's wife worked, saw defendant around 5:30 p.m. the night of the offense. Father Opferman said he had met Gary three weeks earlier, around September 1, 1977, when Gary called him about "working things out better in his life." At the second meeting, the evening of the offense, Gary had come to talk to his wife, whom he had earlier told to leave the house; she had since moved back in with her parents. Father Opferman said Gary acted more agitated than he had three weeks earlier. On that first meeting, the chaplain testified, Gary talked calmly and quietly. On this second meeting, however, Gary's eyes were glassy, he shifted his weight from leg to leg, and he made little eye contact.

For expert testimony on defendant's sanity, defense counsel offered Dr. Emanuel Tanay, who examined defendant for two hours one month after the offense on October 25, 1977, and again on a day during trial. Dr. Tanay also interviewed defendant's mother the day before the first interview with defendant.

Dr. Tanay testified that, within the meaning of the insanity statute,[2] defendant was mentally ill,

[2] MCL 768.21a; MSA 28.1044(1), defines insanity as follows:

"(1) A person is legally insane if, as a result of mental illness as defined in section 400a of Act No. 258 of the Public Acts of 1974, being section 330.1400a of the Michigan Compiled Laws, or as a result of mental retardation as defined in section 500(g) of Act No. 258 of the Public Acts of 1974, being section 330.1500 of the Michigan

could not adhere to the requirements of the law, and most likely could not appreciate, because of his disorganized state of mind, the wrongfulness of his conduct. During the criminal incident, Dr. Tanay testified, defendant was in a psychotic state.

For several reasons, the expert said, defendant suffered from mental illness and an impairment of mood and thought processes when the criminal event occurred. Defendant had no memory or recognition of what had happened. The nature of the crime indicated an extreme brutality and sadism of which most people with any form of conscience or restraint are incapable. There was no evidence of negative feelings by the defendant toward the victim. Defendant's behavior after the offense, in falling asleep on the victim's bed, indicated poor reality testing; the fact that he was in a deep sleep indicated an unusual state of mind. There was also a history of depression prior to the criminal event.

The expert said that defendant felt that his wife was very good to him, but that he was unable to return the affection. Defendant's unwillingness to respond with love and affection for his wife and children, said Dr. Tanay, mirrored his mother's failure to do that for him. Defendant harbored hate feelings toward his mother for her promiscuity. Dr. Tanay was convinced that defendant had suffered criminal abuse as a child. About six months prior to his arrest, defendant essentially raped his wife, Dr. Tanay testified.

To counter the evidence of insanity, the prosecutor offered the testimony of the arresting police

---

Compiled Laws, that person lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

"(2) A person who is under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his alleged offense shall not thereby be deemed to have been legally insane."

officers and a psychologist, although the latter had reached the same conclusions as Dr. Tanay, the defense expert. Dr. Paul B. Revland, a clinical psychologist at the Center for Forensic Psychiatry in Ann Arbor, testified for the prosecution. Dr. Revland examined defendant on May 4 and 8, 1978, the second date to confirm his initial conclusions and to get as much information as possible. Dr. Revland concluded that defendant was not criminally responsible at the time of the crime, that he was mentally ill, and that he was out of contact with reality and unable to control his behavior or appreciate the wrongfulness of his acts. The expert testified that he did not believe defendant was insane all of the time, but that he was insane at the time of the crime and maybe at other times as well.

One paragraph of Dr. Revland's report stated that it was impossible to determine whether defendant's memory loss was due to alcohol-related amnesia or to the repression of psychologically painful material. On this point, Dr. Revland said that he was satisfied to hear that none of the witnesses who were in contact with the defendant that evening (the victim, the four police officers, the chaplain, and defendant's mother-in-law) smelled alcohol on him.

Against this evidence of insanity, the prosecutor posits the testimony of four policemen to sustain the people's burden of proof. Officer Davis testified that at the time of his arrest, defendant appeared to understand and relate to the officers and did not appear to be out of touch with immediate reality. There was also the following testimony from Officer Davis:

"*Mr. Houlahan [prosecuting attorney]:* Were there any actions or any demeanor on the part of Gary

Murphy which would have led you to believe that he may have been suffering from a mental problem at that time?

\* \* \*

"*Mr. Houlahan:* Do you understand the question?
"*A.* Yes, sir, I do. No, sir, there wasn't."

On re-cross examination, Officer Davis said he observed defendant for five minutes. In addition, he testified that he did not believe he was qualified to express an opinion on whether defendant was mentally ill.

Officer Payne, who, with Officer Kornik, transported defendant to the police station, was with defendant for 30 minutes. He testified:

"*By Mr. Houlahan:*
"*Q.* In your observations of the individual, was there anything he did, his manner or actions or his behavior that would put you on notice that he was not of sound mind?
"*A.* None."

Officer York, who said he was present with defendant "just a short time", answered "no" when asked whether there was anything about defendant's behavior which "would put you on notice as to any abnormality". Similarly, Officer Kornik was asked whether, in his observations of defendant, there was anything about him which would have led to the conclusion that defendant was "suffering from any type of mental disorder". "Not from the brief contact I had with him", answered Kornik.

A defendant in a criminal proceeding is presumed sane. Once any evidence of insanity is introduced, however, the prosecution bears the burden of establishing defendant's sanity beyond a

reasonable doubt. *People v Krugman,* 377 Mich 559, 563; 141 NW2d 33 (1966), *People v Garbutt,* 17 Mich 9, 23 (1868). The prosecution does not argue that defendant failed to controvert the presumption of sanity. Thus, defendant's sanity at the time of the crime was as much an element to be proved by the prosecution beyond a reasonable doubt as the other statutory elements of the offenses charged. The presumption of sanity, however, is merely procedural and has no weight as evidence. "[T]he prosecution are at liberty to rest upon the presumption that the accused was sane, *until* that presumption is overcome by the defendant's evidence", *Garbutt,* p 22, meaning that the presumption vanishes and has no continued significance. (Emphasis added.)

The nature and quantum of rebuttal evidence of sanity sufficient to present an issue for a jury is to some extent determined by the strength of the case for insanity. *United States v Bass,* 490 F2d 846, 851 (CA 5, 1974). Necessarily, the sufficiency of evidence needed to put the question of sanity before a jury will vary from case to case. *Wright v United States,* 102 US App DC 36, 39; 250 F2d 4, 7 (1957), *Alto v State,* 565 P2d 492 (Alas, 1977). Merely some evidence of sanity may be sufficient to meet some evidence of insanity and yet wholly insufficient to meet substantial evidence of insanity. *People v Ware,* 187 Colo 28, 31-32; 528 P2d 224, 226 (1974).

Substantial evidence was offered to show defendant's insanity. The psychiatrist introduced by the defense interviewed defendant and his mother one month after the offense occurred. He concluded that defendant was insane. The psychologist called by the prosecution also concluded that the defendant had been insane. Although his examination

took place some months after the offense, he called the defendant back for a second examination to make certain of his conclusions. In addition, the defense presented the testimony of defendant's mother which revealed an unusual childrearing; Dr. Tanay, the defense psychiatrist, opined that defendant had suffered criminal child abuse. Defendant's mother-in-law observed defendant weekly over a period of years. She described a drastic change in defendant's behavior, beginning about six months prior to his arrest, from that of a steady worker and amiable person to a nervous, withdrawn, and suspicious person. Finally, the chaplain observed a change in defendant's behavior between the first time they met and the evening of the offense, about three weeks later, when the defendant appeared greatly agitated.

As against such a strong showing of insanity, the testimony of the police officers failed to supply evidence which could support a finding of sanity beyond a reasonable doubt. The testimony of lay witnesses may be competent evidence of sanity. It may also rebut expert testimony on the issue. *Wright, supra,* 102 US App DC 41-42; 250 F2d 9-10; *Brock v United States,* 387 F2d 254 (CA 5, 1967). At the same time, the prosecution cannot send a case to the jury by opposing substantial evidence of insanity with the testimony of arresting officers that they did not observe a "mental problem".

The probative value of an opinion of sanity depends on the facts upon which it is based. In the present case, for example, there was no testimony that the police officers had observed defendant prior to the night in question so that they might compare his behavior. There was no testimony that at the time of defendant's arrest they were

particularly observant of defendant's behavior for any manifestation of insanity. Moreover, their opportunity to observe defendant was limited to no more than 30 minutes and was as little as five minutes. Officer Davis, who did not believe he was qualified to express an opinion on mental illness, saw defendant for five minutes and said that he did not notice a mental problem. Officer Payne was with defendant for 30 minutes; his answer was "none" when asked if anything about defendant put him on notice that defendant was not of "sound mind". Officers York, who was with defendant "just a short time," and Kornik, who had "brief contact" with defendant, also said that they did not notice any "abnormality" or "mental disorder".

In order to send this case to the jury, the prosecution needed to present something more than minimal evidence of sanity. A lay witness's observation of abnormal acts by the defendant has greater value as evidence than testimony that the witness never observed an abnormal act unless the witness had prolonged and intimate contact with the accused. *Wright, supra,* p 42; 250 F2d 10. The testimony of these police officers that the defendant seemed all right has only slight probative value. Moreover, it is not clear that the witnesses' testimony actually negated any part of the insanity test, which requires the prosecutor to prove that the defendant could appreciate the wrongfulness of his conduct and had the capacity to conform his conduct to the requirements of the law. Something more is needed than was presented here in order to pass appellate muster.

In order to bolster the evidence of sanity, the prosecutor argues that the jury could draw inferences and conclusions from the victim's testimony,

although the victim did not give an opinion on defendant's sanity. Exactly what inferences and conclusions may have been drawn are not suggested, and we are unable to discern what they might be. The prosecutor also notes that Dr. Tanay did not know why defendant was unable to conform to the requirements of the law, that he admitted that people in all applied sciences differ in their opinions, that he admitted that he testified more commonly for the defense, and that Dr. Revland was young and relatively inexperienced. None of this testimony, however, is evidence of sanity. Finally, the prosecutor points to the results of the Minnesota Multiphasic Personality Inventory, given defendant by Dr. Tanay, which cautioned that the defendant gave an unusual number of extremely rare responses. This too is not evidence of sanity. Nevertheless, we have considered these arguments in viewing the evidence in the light most favorable to the prosecution, as we must in considering the sufficiency of all the evidence.

In short, all of the vital evidence in this case pointed towards defendant's insanity at the time of the offense. In protecting the constitutional standard of proof in criminal cases, *In re Winship*, 397 US 358; 90 S Ct 1068; 25 L Ed 2d 368 (1970), we conclude that the evidence of sanity offered by the prosecution was insufficient to convince any rational trier of fact that the defendant was sane beyond a reasonable doubt.

As the Court of Appeals correctly noted, the Double Jeopardy Clause, US Const, Am V, prohibits a second trial once a reviewing court has found the evidence insufficient to sustain the jury's verdict of guilty. *Burks v United States*, 437 US 1; 98 S Ct 2141; 57 L Ed 2d 1 (1978).

We affirm the judgment of the Court of Appeals and remand the cause for entry of a judgment of not guilty by reason of insanity and an order committing defendant for psychiatric treatment pursuant to MCL 330.2050; MSA 14.800(1050).

FITZGERALD, C.J., and WILLIAMS, LEVIN, and RYAN, JJ., concurred with KAVANAGH, J.

COLEMAN, J. I write separately because I do not believe that the prosecutor should have the burden of proving defendant's sanity beyond a reasonable doubt.

RILEY, J., took no part in the decision of this case.