# Order

**Michigan Supreme Court**
**Lansing, Michigan**

November 6, 2009

Marilyn Kelly,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway,
Justices

137374

PEOPLE OF THE STATE OF MICHIGAN,
       Plaintiff-Appellant,

v

PAMELA MALAKINIAN WEDDELL,
       Defendant-Appellee.

SC: 137374
COA: 277067
Newaygo CC: 06-008767-FH

_____/

On order of the Court, the application for leave to appeal the July 31, 2008 judgment of the Court of Appeals is considered and, pursuant to MCR 7.302(H)(1), in lieu of granting leave to appeal, we REVERSE the judgment of the Court of Appeals and REINSTATE the trial court's judgment. In this case, the defendant presented evidence to support her theory that she was not guilty by reason of insanity. The prosecutor rebutted that evidence and impeached the defendant's witnesses. "It is the province of the jury to determine questions of fact and assess the credibility of witnesses." *People v Lemmon*, 456 Mich 625, 637 (1998). In light of the evidence presented, the trial court did not abuse its discretion by denying the defendant's motion for a new trial on the basis that the verdicts were against the great weight of the evidence after a jury convicted the defendant of being guilty but mentally ill of fleeing and eluding a police officer resulting in a collision, MCL 257.602a(3)(a), and malicious or willful destruction of police property, MCL 750.377b.

CORRIGAN, J. (*concurring*).

I concur with the order reinstating the jury's verdict of guilty but mentally ill. I write to underscore why the Court of Appeals erred when it reversed the jury's verdict of guilty but mentally ill as against the great weight of the evidence and held that the trial court abused its discretion by denying defendant's motion for a new trial. The jury's verdict was not against the great weight of the evidence. Instead, this thoughtful jury's verdict was well-supported on the only issue before it—defendant's state of mind during the crime.

Not only did the prosecutor successfully impeach the testimony of the lone forensic psychologist who supported defendant's claim of insanity, but videotaped evidence of the crime and lay witness testimony supports the jury's measured and sound conclusion. The jury found that defendant was guilty but mentally ill on the charge of eluding a police officer, resulting in a collision and malicious or willful destruction of police property. Because the evidence fully supported the jury's verdict, I concur with the peremptory order reinstating the jury verdict.

## I. Background

Defendant, a veteran attorney, suffered for some time from Bipolar I Disorder. On February 10, 2006, she drove her vehicle into Fremont with a large duffle bag attached to the hood ornament. An off-duty police officer observed her vehicle and activated his overhead lights. When defendant slowly accelerated away from the officer, he activated his siren. During a 12 minute, four mile pursuit, defendant stopped at a traffic light, traveled in the correct lane, and did not speed. At one point, however, defendant slammed on her brakes, causing the officer to collide with her vehicle and damaging his vehicle. After the collision, defendant took off. A second police officer joined the pursuit. The second officer used the video recording system in her vehicle to record the pursuit after the initial collision until defendant's apprehension.

Soon after the second officer became involved, two other police officers joined the pursuit. After a few failed attempts, the officers successfully surrounded defendant's vehicle and repeatedly instructed her to exit from it. Instead, defendant drove forward, colliding with the same vehicle involved in the initial collision. When she could not escape using her vehicle, the police forcibly removed her from it. Defendant remained in the backseat of a police vehicle for about an hour before an officer transported her to a nearby hospital for a psychiatric evaluation. The officers also recorded defendant's behavior in the backseat. Both video recordings were viewed by the jury.

Defendant was charged with eluding a police officer resulting in a collision[1] and with malicious or willful destruction of police property.[2] Before the trial, defendant moved to disqualify the assigned judge, the elected prosecutor, and the entire prosecutor's office on several bases. Defendant averred that disparaging comments had been made during the 1996 campaign when defendant opposed the assigned judge for a circuit judgeship. Defendant claimed that the assigned judge could not be "totally objective." Defendant also moved to disqualify the elected prosecutor because the prosecutor had filed a grievance against her with the Attorney Grievance Commission in 1997. Defendant claimed that the dismissal of this grievance led to a "personal vendetta"

---

[1] MCL 257.602a(3)(a).

[2] MCL 750.377b.

by the prosecutor.  Finally, because the prosecutor supervised the assistant prosecuting attorneys, defendant argued that the entire prosecutor's office should be recused.

The assigned judge withdrew on his own motion, so a different judge was assigned.  That judge thereafter denied defendant's motion to disqualify the prosecutor and the entire prosecutor's office.[3]  Defendant next interposed legal insanity as an affirmative defense.[4]  Consequently, the trial court ordered defendant to undergo examinations regarding her competency to stand trial[5] and her criminal responsibility.[6]  Dr. Peggy Heffner, the assigned psychologist from the Center for Forensic Psychiatry, subsequently opined that defendant was competent to stand trial but was not criminally responsible.

From the outset, the prosecutor and defense counsel acknowledged the very narrow issue before the jury.  Both sides agreed that the charged offenses took place and that defendant suffered from a mental illness.  The dispositive issue, according to both counsel, was whether defendant was legally insane or guilty but mentally ill when the crime occurred.  In his opening statement, the prosecutor argued that only one witness, Dr. Heffner, was qualified to testify about the legal differences between a verdict of not guilty by reason of insanity and a verdict of guilty but mentally ill.  The prosecutor asserted that cross-examination would reveal that Dr. Heffner's testimony was nonetheless insufficient to meet defendant's burden of showing legal insanity by a preponderance of the evidence.  Defense counsel disagreed, arguing that the evidence would show that defendant was legally insane because she was unable to differentiate between right and wrong and to conform her conduct to the law.

The trial lasted two days.  The prosecutor called six witnesses and introduced 13 exhibits, including the video recording of the crime discussed earlier.  The trial court thereafter denied defendant's motion for a directed verdict, finding sufficient evidence to create a jury question.  Defense counsel then called eight witnesses and introduced one exhibit, the video recording of defendant in the back of the police vehicle.  Because the trial court permitted the jury to ask questions, the jurors submitted several questions to various witnesses after the court and counsel filtered them. During the attorneys' closing arguments, the prosecutor and defense counsel reiterated that the dispositive issue was whether defendant was legally insane or mentally ill at the time of the charged offenses.

---

[3] The Court of Appeals correctly held that "defendant's argument that the prosecutor harbored a personal grudge against her and should have been disqualified lacks merit." *People v Weddell*, unpublished opinion per curiam of the Court of Appeals, issued July 31, 2008 (Docket No. 277067), at 5.

[4] See MCL 768.21a.

[5] MCL 330.2026(1).

[6] MCL 768.20a(2).

Defense counsel explained, "[I]f you decide that I have not proven by a preponderance of the evidence, [that] it's more likely than not that she was legally insane at the time of the crime, . . . then your verdict is guilty but mentally ill. If however you find that I have proven by a preponderance, not beyond a reasonable doubt, just by a preponderance, that[] [it is] more likely than not that she was legally insane at the time of the crime, then your verdict is guilty by reason of insanity." After deliberating less than one hour, the jury found defendant guilty but mentally ill of both offenses.

Defendant moved for a new trial, asserting that the verdict was against the great weight of the evidence. The prosecutor responded that the jury's verdict should stand because defendant failed to shoulder her burden of proof concerning legal insanity at the time of the crime, and further that the jury was free to disregard an expert opinion. The trial court denied defendant's motion. On appeal, the Court of Appeals reversed and remanded for a new trial.[7] The Court of Appeals concluded that "the jury's verdict unquestionably was against the great weight of the evidence" because of "the absence of evidence in the record contradicting the conclusion that defendant was legally insane at the time she committed the instant offenses."[8] The Court of Appeals manifestly erred by holding that the record lacked such evidence. This record was replete with evidence in support of the jury's conscientious verdict.

## II. Analysis

We review a trial court's denial of a motion for new trial for abuse of discretion.[9] An abuse of discretion occurs when a trial court chooses an outcome falling outside the range of principled outcomes.[10] To determine whether a verdict is against the great weight of the evidence, a reviewing court analyzes whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand.[11] Additionally, "unless it can be said that directly contradictory testimony was so far impeached that it 'was deprived of all probative value or that the jury could not believe it,' or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination."[12]

In this case, the Court of Appeals erred when it concluded that the jury's verdict was against the great weight of the evidence and held that the trial court abused its

---

[7] *People v Weddell*, *supra*.

[8] *Id.* at 5.

[9] *People v Cress*, 468 Mich 678, 691 (2003).

[10] *People v Babcock*, 469 Mich 247, 269 (2003).

[11] *People v Lemmon*, 456 Mich 625, 627 (1998).

[12] *Id.* at 645-646 (citation omitted).

discretion by denying defendant's motion for a new trial. The Court merely emphasized the number of mental health experts who testified on defendant's behalf without analyzing the substance of their testimony. The Court of Appeals also opined that lay testimony buttressed the unanimous testimony of the mental health experts. Yet, the Court offered no record support for this bald contention. Moreover, the Court entirely ignored substantial defects in defendant's case.

### A. *Testimony of Defense Mental Health Experts*

Three mental health experts testified that defendant was legally insane. Only one of those experts, Dr. Heffner, specialized in forensic psychology. The other two mental health experts specialized in child and adolescent psychiatry and general psychiatry. Both Dr. Dhanu Mahesh and Dr. Curt Cunningham candidly acknowledged having no expertise in forensic psychology. Ignoring this weakness, the Court of Appeals emphasized the number of defense experts. The Court ignored outright the prosecutor's effective cross-examination that discredited these experts' views—testimony that the jury heard and heeded. For example, when defense counsel asked whether defendant could tell the difference between right and wrong, Dr. Mahesh responded, "[T]hat can be at so many different levels, you know, so I don't know how to answer that."

The prosecutor also questioned how Drs. Mahesh and Cunningham could opine about defendant's mental state at the time of incident when they did not see her until after her arrest. The prosecutor specifically asked Dr. Cunningham how he could offer a professional opinion regarding insanity "even though you don't know any of the details of the crime and how she was acting in that crime beyond what was told to you by defendant and her husband." Dr. Heffner admitted that she would never "make a determination of someone's legal responsibility without first reviewing the police report or some third-party's source that described the incident." Notably, Drs. Mahesh and Cunningham were impeached because they did not review the police report or any third-party accounts of the incident. They relied only on defendant's and her husband's accounts of what transpired. Thus, the prosecutor effectively discredited this defense testimony.

The prosecutor also elicited testimony that neither Dr. Cunningham nor Dr. Heffner compensated for the probability that defendant, as a veteran attorney, understood better than the general population the difference between a verdict of not guilty by reason of insanity and a verdict of guilty but mentally ill. Dr. Heffner acknowledged that among the approximately 100 individuals that she evaluates each year, only "two or three percent" of them were highly educated professionals. Nevertheless, Dr. Heffner could not recall whether she spoke to defendant about the conceptual difference between a verdict of guilty but mentally ill and not guilty by reason of insanity in light of defendant's professional background.

Moreover, the prosecutor repeatedly questioned the defense experts regarding whether defendant could have eluded the police when she was suffering symptoms of mental illness, and only after a triggering event, such as crashing into the officer's vehicle or being arrested, did she suffer a full manic episode that rendered her legally insane. The prosecutor elicited testimony that none of the defense experts could specify when defendant's mental state crossed the line from mental illness to legal insanity. Significantly, Dr. Heffner could not opine about the exact moment defendant became legally insane:

> *Q.* All right. Can you say with any sort of certainty when the Defendant lost her ability to be sane?
>
> *A.* At the exact moment?
>
> *Q.* Yes.
>
> *A.* Certainly I could not.
>
> *Q.* How do you know it didn't happen in the middle of the chase? How do you know that [sic, the] first decision she made to flee and elude the police was not made when she was sane?
>
> *A.* (No response.)
>
> *Q.* You can't answer that question?
>
> *A.* I cannot answer that.

The prosecutor reiterated the importance of Dr. Heffner's inability to answer questions regarding the temporal shift between mental illness and legal insanity during his closing argument, stating:

> So there's this sort of undulation like this of mania, and the doctor said some certain point you reach the point where you're insane about this line. In other parts you're still manic but not insane. All right? So I asked the doctor, "Tell me at what point she reached insanity along this continuum, Dr. Heffner; can you answer that question?" And her answer to that question was, "I cannot say." She has not given you enough of an informed opinion in order for you to find by a preponderance of the evidence that at the time of the crime the defendant was legally insane.

Having carefully reviewed the record, I conclude that the Court of Appeals wrongly emphasized the *number* of experts testifying on defendant's behalf instead of the *nature and quality* of their testimony.

*B. Testimony of Lay Witnesses and Video Recordings Introduced as Exhibits*

I also reject the suggestion of the Court of Appeals that various lay witnesses, including the police officers, bolstered the testimony of the defense experts. This assertion is utterly unsupported. Indeed, the record supports the opposite conclusion—defendant, although mentally ill, did know right from wrong and could conform her conduct to the requirements of the law.

Deputy Sheriff Phil Green testified that defendant stopped at a traffic light, remained in the correct lane of travel, and did not speed. The video recording corroborated Deputy Sheriff Green's testimony in every respect. Additionally, the evidence showed that defendant was alert and responsive even after the criminal episode. Sergeant Tim Deater testified that after her arrest and the advice of rights, defendant stated that she understood her rights and would answer questions. A video recording also captured this pertinent exchange.

Accordingly, I reject the incorrect assertion by the Court of Appeals that lay testimony corroborated the defense experts' testimony.

## C. Province of the Jury

This Court has recognized that "[i]t is the province of the jury to determine questions of fact and assess the credibility of witnesses."[13] A jury enjoys the same power to assess the credibility of experts and lay persons regarding the issue of insanity. "The jury is the ultimate judge of defendant's sanity at the time of the crime, and in this case, since it had before it evidence of defendant's behavior and state of mind upon the basis of which it could have found defendant sane at that time, it was not bound by the expert opinion testimony of the doctor."[14] When instructing the jurors, the trial court explained the importance of credibility determinations about expert witnesses:

> You've heard the testimony from witnesses who are qualified in the area of psychiatry and the treatment of mental illness. . . . However, you do not have to believe an expert's opinion. Instead, you should decide whether you believe it and how important you think it is. When you decide whether you believe an expert's opinion, think carefully about the reasons and facts that he or she gave for their opinion, and whether those facts are true. You should also think about the expert's qualifications, and whether their

---

[13] *Id.* at 637.

[14] *People v Krugman*, 377 Mich 559, 563 (1966); see also *Vial v Vial*, 369 Mich 534, 537 (1963) ("Indeed, no trier or triers of fact are bound to accept opinion testimony, however expert and authoritative, as they proceed to determine issues of fact duly committed to them for finding or verdict.").

opinion makes sense when you think about all the other evidence in the case.

As the trial court explained, it is the jury's duty to resolve issues concerning expert witness credibility. Here, the trial court expressly instructed the jurors to decide whether it believed an expert's opinion and how important it believed that expert's testimony to be. Jurors are presumed to follow instructions.[15]

Nevertheless, our Court of Appeals failed to honor the verdict of twelve citizens. Instead, it made its own credibility determination that "the unanimous testimony from the mental health experts – preponderates heavily against the verdict."[16] In so doing, the Court of Appeals ignored the jury's right to disregard an expert's opinion. It is troubling that the Court of Appeals invaded the province of the jury when the record reveals that the jurors were attentive and engaged throughout the trial, as illustrated by their probing questions.[17]

---

[15] *People v Graves*, 458 Mich 476, 486 (1998).

[16] *People v Weddell*, *supra* at 4.

[17] The jurors asked about ten questions during the two day trial. Because of the objectionable nature of some questions, the trial court declined to allow them. Nevertheless, the trial court, with the attorneys' consent, allowed the following questions:

> (1) Doctor, do you feel that Ms. Weddell might be a danger to others if another episode could occur when she is driving or otherwise?
>
> (2) Doctor, would it be possible for a person with a mental illness to have the knowledge to fake an episode like this to some extent?
>
> (3) Do you have any reason to believe that Ms. Weddell was doing anything to try to fake symptoms on the date that you saw her?
>
> (4) Doctor, do you feel Ms. Weddell has her bipolar disorder under control at this time?
>
> (5) What is the likelihood of a reoccurrence of another episode?
>
> (6) Do you think she has insight into her situation so that she would recognize when she was entering into one of these episodes similar to what led to the incident that we're here for?
>
> (7) If you had seen Ms. Weddell before the Friday episode that we've been talking about here and after her husband had called you, do you believe this incident would have been avoided?
>
> (8) The testimony yesterday from the police officers is that Ms. Weddell was ignoring their signals to stop her vehicle, but she was still stopping at traffic signals. Yet when she was finally stopped she was nonresponsive

The jury's verdict reflected its obvious finding that defendant did not establish by a preponderance of the evidence that she "lacked the substantial capacity either to appreciate the nature and quality or the wrongfulness of . . . her conduct or to conform . . . her conduct to the requirements of the law."[18]

## D. Defendant's Motion for a New Trial

Finally, the trial court's decision to deny defendant's motion for a new trial did not fall outside the range of principled outcomes. The trial court explained:

> In this case the motion for the judgment not withstanding [sic] the verdict or alternatively for a new trial focused in on the issue of the determination of the jury to reject the defendant's defense of insanity. Instead, in this case the jury agreed that there was a mental illness component, but by its verdict determined that it didn't rise to the level of insanity or what we call legal responsibility.

> Under our law, this is probably about the only issue that I know of where the defendant does have the burden of proof. The burden of proof on her part is by the preponderance of the evidence. And by virtue of the jury's verdict, obviously they reached the conclusion that she did not meet the burden of proof on that issue, although agreeing that she did suffer from a mental illness.

> Now in reviewing these motions, the law is clear that the court is not to sit as a thirteenth juror, that ordinarily the court is not to substitute its judgment for the judgment of the jury ordinarily [sic]. In this case that even if it's a situation where I as a Judge very likely or possibly could have reached a different view, that doesn't necessarily mean I set aside the jury verdict.

> In this case we had the – the defense points out that there was expert testimony, and basically all of the experts offered the opinion that she was not legally responsible. However, the law is clear that the mere opinion of

---

to verbal commands. Are those factors consistent with someone who is experiencing a full-blown psychotic episode?

[18] MCL 768.36(1)(c). MCL 768.36(1)(a) and (b) provide two additional requirements to find defendant guilty but mentally ill:

(a) The defendant is guilty beyond a reasonable doubt of an offense.

(b) The defendant has proven by a preponderance of the evidence that he or she was mentally ill at the time of the commission of that offense.

experts is not binding on the jury. In fact, there's a standard instruction where I read to the jury that they are not obligated to accept the opinion of experts. They can consider the opinions of the experts if they feel that the evidence supports that opinion.

So in this case, even though it's a situation where I very well may have reached a different conclusion, the Court having taken a hard look at this because I feel that there was direct evidence presented regarding her behavior, and also the prosecutor's examination of the experts is sufficient to support the jury's conclusion that she did not meet her burden of proof.

In light of the trial court's explanation, I reject the Court of Appeals view that the trial court's decision was unprincipled. The trial court acknowledged that it might have reached a conclusion different from that of the jury. Nevertheless, the trial court explained that it would be inappropriate to "substitute its judgment for the judgment of the jury." Moreover, the trial court took "a hard look" at this case before concluding that the jury's conclusion that defendant "did not meet her burden of proof" was adequately supported. The trial court had an excellent, first hand opportunity to assess the evidence and evaluate whether that evidence preponderated so heavily against the jury's verdict that a miscarriage of justice would result if the verdict were allowed to stand.[19] Accordingly, I conclude that the trial court's decision fell within the range of principled outcomes.

## III. Conclusion

The Court of Appeals manifestly erred when it concluded that "the jury's verdict unquestionably was against the great weight of the evidence."[20] The record reveals ample evidence in support of the jury's conclusion that defendant did not meet her burden of proof by a preponderance of the evidence. "As the trier of fact, the jury is the final judge of credibility."[21] Moreover, the jury could and did lawfully disregard an expert's opinion as the cross-examination of defense experts discredited their opinions. Consequently, I would respect the jury's right to determine whom to credit and whether defendant shouldered her evidentiary burden. Because the jury's verdict was fully supported by the evidence and because the trial court did not abuse its discretion, I concur with the order reinstating the jury's verdict.

KELLY, C.J. (*dissenting*).

---

[19] *Lemmon, supra* at 627.

[20] *People v Weddell*, *supra* at 5.

[21] *Lemmon, supra* at 637 (quotation marks and citation omitted).

I dissent from the order peremptorily reversing the Court of Appeals decision. The evidence is overwhelming that defendant was legally insane at the time she committed the offenses in question. The Court of Appeals correctly held that the jury's verdict of guilty but mentally ill is against the great weight of the evidence.

## FACTS AND PROCEDURAL HISTORY

After an automobile accident, defendant was charged with fleeing and eluding a police officer resulting in collision[22] and malicious or willful destruction of police property.[23] A jury found her guilty but mentally ill. Defense counsel moved for a new trial on the basis that the verdicts were against the great weight of the evidence. The trial court denied the motion. The Court of Appeals unanimously held that the trial court had abused its discretion and that defendant was entitled to a new trial because the verdicts were against the great weight of the evidence.

Defendant has been diagnosed as suffering from Bipolar I Disorder.[24] Her bipolar disorder was so severe for a period before the incident in question that she was committed to a psychiatric hospital. On February 8, 2006, her disorder began acting up again. Defendant awoke in the middle of the night screaming. She told her husband she was experiencing an "in and out" feeling. The next day, defendant's problems did not go away. She had trouble thinking clearly, was acting in a confused manner, and kept repeating herself. Defendant's husband wanted to take her to the doctor immediately, but the doctor could not see her until two days later.

On the day of defendant's appointment with her doctor, she went to the garage and got into a family car. Instead of putting the car in reverse to back out, as one would expect, she put the car in drive. She accelerated forward, slamming the vehicle into the garage wall hard enough to crack the wall. A large hockey bag on a shelf became affixed to the front grillwork of the car when she slammed into it. Lawn chairs became wedged under the car. Shattered glass was everywhere. With the bag hanging from the grille, defendant backed out of the garage and onto the road, dragging the lawn chairs under her.[25]

---

[22] MCL 257.602a(3)(a).

[23] MCL 750.377b.

[24] Of the four types of bipolar disorder, Bipolar I is the most severe. It is "defined by manic or mixed episodes that last at least seven days, or by manic symptoms that are so severe that the person needs immediate hospital care." National Institute of Mental Health, *Bipolar Disorder, available at http://www.nimh.nih.gov/health/publications/bipolar-disorder/complete-index.shtml*

[25] Attached are pictures of defendant's car with the hockey bag attached. As one can see, the hockey bag is bright yellow and very large, spanning half of the front end of the

An off-duty police officer spotted defendant's car with the large bag hanging from the front and attempted to stop it. But defendant did not stop. She continued down the road, sometimes obeying traffic signals, other times driving erratically. At one point, defendant drove into oncoming traffic and onto the opposite shoulder of the road. At other times, she drove in the proper traffic lane.

Officers eventually boxed in defendant's vehicle. They found defendant in a confused state. She did not acknowledge the police officers who ordered her out of her car at gunpoint. The officers had to smash the window of her car and pull her out. She was incoherent, mumbling gibberish, repeating "billions and billions of years ago." At one point, it appeared that she was talking to someone who was not there. She asked if she could "wake up now."

Defendant's husband of 17 years eventually arrived at the scene. She did not recognize him. Realizing that defendant was suffering from a medical problem, the arresting officers did not take her to jail, but drove her directly to the hospital. She was transferred to a psychiatric ward. Defendant's delusions continued at the psychiatric facility, where she told the medical staff, "[I]t's a nuclear disaster," "It's a million years ago, isn't it?" "I'm in the womb," "This is a test," "Is the test over yet?" and "This is a disaster. Nuclear disaster. Nuclear disaster." Defendant's delusions continued into the night, and did not stop until the doctors gave her drugs that put her to sleep. She remained at the psychiatric facility for six days.

ANALYSIS

A trial court abuses its discretion when, in denying a motion, it renders a decision that is against the great weight of the evidence.[26] Insanity is an affirmative defense. A defendant is legally insane when he or she lacks "substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or conform his or her conduct to the requirements of the law."[27] The defendant has the burden of proving insanity by a preponderance of the evidence.[28] Proof by a preponderance of the evidence requires less certainty than proof beyond a reasonable doubt. The defendant merely

---

vehicle. It is no surprise that an officer at a distance from the vehicle was able to spot it. What is noteworthy is that defendant, who had just slammed into the bag and was within a few feet of it, was oblivious to its presence.

[26] *People v Abraham,* 256 Mich App 265 (2003).

[27] MCL 768.21a(1).

[28] MCL 768.21a(3).

needs to establish that "the evidence supporting [defendant's insanity] outweighs the evidence supporting its nonexistence."[29]

## *Defendant's Burden*

In this case, defendant attempted to meet her burden through the testimony of several mental health experts, laypersons, and other evidence.

Dr. Peggy Heffner is employed by the state of Michigan as a psychologist and has worked at the Center for Forensic Psychiatry since 1976.[30] She specializes in forensic psychology and has evaluated approximately 2000 patients. She testified that defendant was legally insane at the time of the offense. She also stated:

> My opinion is that at the time of the alleged offense not only was Mrs. Weddell evidencing a mental illness, which is another part of the connection to that, but also as a result of that mental illness she was unable to understand the nature and quality of her behavior or the wrongfulness of her behavior, and she was unable to conform her behavior to the requirements of the law.

Dr. Curt Cunningham is an experienced psychiatrist who has treated the defendant for her bipolar disorder since 1998. He has qualified as an expert witness at least half a dozen times and has testified before on the issue of legal insanity. He stated:

> *A.* Well, if I were to summarize my opinion about everything that I've said so far, Ms. Weddell at the time of this accident was clearly psychotic. She was delusional. Was not responsible for her behavior. I have absolutely no doubt about that. This was complete—There just simply is no other explanation. So if that's the kind of thing that you were asking me, that's my opinion.
>
> *Q.* All right. And like you said, you've testified before about people's legal insanity at the time of the offense, correct?
>
> *A.* Yes.

* * *

---

[29] See *Blue Cross & Blue Shield of Michigan v Governor,* 422 Mich 1, 89 (1985).

[30] The state of Michigan runs the Center for Forensic Psychiatry as an arm of the Department of Mental Health. The Center provides diagnostic evaluation of patients that the criminal courts commit to the Department of Mental Health.

*Q.* Did [defendant] lack the substantial capacity to either appreciate the nature and quality of or the wrongfulness of her conduct, or to conform her conduct to the requirements of the law?

*A.* Yes, she lacked that capacity.

*Q.* Now when you say "yes," there are a couple or's and that sort of thing in here, so to break this question up a little bit more: Did she lack the substantial capacity to appreciate the nature and quality of her actions?

*A.* Yes.

*Q.* Did she lack the substantial capacity to appreciate the wrongfulness of her conduct?

*A.* Yes.

* * *

*Q.* More specifically, did she lack the substantial capacity to conform her conduct to the requirements of the law?

*A.* Yes.

Dr. Cunningham also testified that defendant lacked the ability to tell the difference between right and wrong on the date of the incident.

Dr. Dhanu Mahesh is a staff psychiatrist who saw defendant numerous times while she was in the hospital. The trial court qualified her as an expert in adult psychiatry. In Dr. Mahesh's opinion, defendant was legally insane on the day of the offense:

*Q.* Because of her mental illness, in your professional opinion, did [defendant] lack the capacity to appreciate the nature and quality of her conduct?

*A.* Yes.

*Q.* How do you reach that conclusion?

*A.* Because the mania itself makes people have very poor judgment.

*Q.* In your professional opinion, because of her mental illness, did Ms. Weddell lack the capacity to appreciate the wrongfulness of her actions?

*A.* Yes.

*Q.* And why do you believe that?

*A.* Because she was in a delusional state and she was not really aware of what she was doing; cognizant of what she was doing.

*Q.* And as a result, was she unable to conform her conduct to the requirements of the law?

*A.* Yes.

\* \* \*

*Q.* Do you believe that she was legally insane on the day of the offense?

*A.* Yes, I believe so.

Dr. Julie Gage was the emergency room physician who saw defendant when the police brought her to the hospital. Dr. Gage diagnosed defendant as "overtly actively psychotic." She testified that defendant did not know where she was, that her behavior was "very disjointed," and that she was disconnected from reality. Defendant continued her ramblings to Dr. Gage about nuclear disaster and "millions of years ago."

Lance Decker is the mental health facilitator of the psychiatric facility to which defendant was brought after her stay in the hospital. He spent eight hours with defendant on the first day he met her. Mr. Decker testified that, when he met with defendant, she was talking rapidly and not making sense. He also testified that defendant "was not orientated to time, date or place" and "did not know where she was at." Finally, Mr. Decker stated that defendant "was not capable of caring for herself in any shape, manner or form."

Defendant's husband testified about defendant's history of mental problems, her abnormal behavior just before the day of the incident, and her behavior following the accident. Police officers also testified about defendant's bizarre behavior on the day of the incident.

As the Court of Appeals noted, the circumstantial evidence surrounding the incident and testimony from lay persons buttress the testimony from the mental health experts. There was no rational reason for defendant to flee from the police. She had not committed a crime and was not under the influence of drugs or alcohol. Her behavior was abnormal. She drove into her garage wall. She left the garage door open with lawn chairs strewn across the street. Her bizarre behavior occurring immediately before and after the charged offense only strengthens the mental health experts' determination that defendant was legally insane at the time she committed the offense.

Defendant went above and beyond her burden of proving the defense of insanity by a preponderance of the evidence. Once she met this burden, the prosecution was required to establish defendant's sanity beyond a reasonable doubt.[31]

---

[31] *People v Murphy,* 416 Mich 453, 463-464 (1982).

*Prosecution's Burden*

The prosecution presented very little evidence on the issue of defendant's sanity. It did not present a single mental health expert. Instead, it attempted to impeach the mental health experts who testified in support of defendant. However, the experts would not budge on their determination that defendant was legally insane.

In closing argument, the prosecution suggested to the jury that the testimony of one of the mental health experts, Dr. Heffner, that defendant "faked good" during the Minnesota Multiphasic Personality Inventory Test (MMPI) confirmed that defendant was not insane. This flies in the face of *Murphy,* where the prosecution also tried to use the results of the MMPI to undermine the defendant's insanity claim.[32] This Court stated that an abnormal MMPI is not "evidence of sanity."[33] Therefore, the results do not help the prosecution meet its burden. Furthermore, this argument is particularly disingenuous in this case.

"Faked good" sounds like defendant tried to fake a mental condition. But Dr. Heffner explained that "faked good" is a trade term used by psychologists to mean that the subject is denying the presence of problems. So, what defendant did here was pretend that she was sane. If she had tried to "fake" that she was insane, she would have attempted to make the doctor think she was worse off than she really was. Dr. Heffner explained that this is called "faking bad." The fact that defendant tried to underplay her mental problems to Dr. Heffner actually supports the defense theory of insanity, not the prosecution.[34]

The prosecution also attempted to use the testimony of the arresting police officers to meet its burden. Deputy Phil Green testified that, although defendant had a hockey bag hanging from the front of her car, defendant stayed in the correct traffic lane during "most of the chase." But he admitted that she accelerated erratically, slammed on her brakes, swerved her vehicle, failed to stop for the police, and drove into oncoming traffic. Deputy Green also testified that, although defendant did not pull over right away, her driving was not like that of a person trying to flee and elude the police. The fact that defendant followed some traffic laws is not sufficient to overcome the substantial evidence that defendant could not conform her conduct to the requirements of the law. Some competent evidence of sanity may suffice when a defendant has introduced only

---

[32] *Id.* at 467.

[33] *Id.*

[34] The prosecution also made this argument in its brief to the Court of Appeals.

token evidence of insanity. However, this same evidence of sanity may be totally inadequate when the defendant's evidence of insanity is substantial.[35]

The prosecution also argues that defendant did not become delusional until after she had committed the offenses. This simply is not supported by the evidence. Thirteen witnesses in all testified at trial. All 13, including the prosecution's own witnesses, offered evidence that defendant was delusional. Three of the witnesses were mental health experts. All three mental health experts found that defendant was legally insane at the time of the offense.

Perhaps most persuasive of all, the state of Michigan's own forensic center, which evaluates thousands of individuals a year for the insanity defense, found defendant legally insane at the time of the offense. The lay testimony and circumstantial evidence supported the experts' determination. Defendant drove straight into a garage wall and then back out onto the street, oblivious to a duffel bag attached to the car and lawn chairs dragging beneath. Defendant's actions after the incident were no better: mumbling incoherent phrases about nuclear disaster and millions of years from now. This behavior is explicable in light of defendant's history of mental illness.

It is not credible, as the prosecution contends, that defendant had a moment of lucidity amidst all this behavior, during which she committed the offenses in question. The prosecutor's "moment of clarity" theory also flies in the face of defendant's diagnosed Bipolar Disorder I. The disorder is specifically characterized by manic episodes lasting *at least seven days*. Defendant began exhibiting delusional symptoms three days before the incident with police. Medical experts testified that a person can continue mundane, routine behaviors, such as obeying traffic signals, when suffering from a manic episode. The prosecution's theory that defendant became sane in the middle of a manic episode, only to slide back in after she committed criminal acts, flies in the face of the evidence. Unsupported speculation is not evidence that defendant was sane.

The evidence offered by the prosecution was wholly insufficient to convince any rational trier of fact that the defendant was sane beyond a reasonable doubt. The prosecution failed to meet its burden of proving that defendant was sane.

---

[35] *Murphy, supra* at 464.

RESPECTING PRECEDENT

The Court of Appeals decision is not only appropriate, it is compelled by this Court's decision in *People v Murphy*.[36] In *Murphy*, substantial evidence was offered to show that the defendant was insane. To rebut this, the prosecution used the testimony of four police officers whose contact with the defendant was minimal and occurred only after the crime. The arresting officers testified they did not observe a "mental problem" with defendant.[37] This Court held that "against such a strong showing of insanity, the testimony of the police officers failed to supply evidence which could support a finding of sanity beyond a reasonable doubt."[38] This Court concluded that the prosecutor needed to present something more than minimal evidence of sanity under the circumstances, where all of the vital evidence pointed toward the defendant's insanity. Of particular importance, this Court stated that a "laywitness's observation of abnormal acts by the defendant has greater value as evidence than testimony that the witness never observed an abnormal act unless the witness had prolonged and intimate contact with the accused."[39]

In the current case, the prosecution introduced even less evidence of sanity than in *Murphy*. As in *Murphy,* the police officers here observed defendant for a short time, much less than did the mental health experts or her husband. Moreover, it cannot be said that the arresting officers saw no mental problem in defendant's behavior: as soon as her husband got to the scene, they asked if his wife had a mental problem, then her husband took her directly to the hospital for a psychiatric evaluation. The officers believed that defendant had a mental problem.

Justice Corrigan asserts that the lay witnesses who testified did not bolster the testimony of the defense experts. She points to police officers' testimony that defendant followed some traffic laws and responded to their questions saying that she understood her rights. However, as discussed previously, the officers' observation of abnormal acts such as erratic driving and delusional behavior is of greater value in evaluating defendant's insanity than minimal normal behavior.[40] The officers' testimony that defendant did some things normally only has slight probative value.[41] A defendant need not exhibit only abnormal behavior to be legally insane.

---

[36] *Murphy, supra*.

[37] *Id.* at 465.

[38] *Id*.

[39] *Id*. at 466.

[40] See *id*.

[41] *Id*.

The overwhelming weight of the evidence is that defendant was insane at the time of the offense. Moreover, the prosecutor failed to introduce sufficient evidence that defendant was sane beyond a reasonable doubt. Hence, a verdict of guilty but mentally ill cannot stand.[42] The prosecution in this case fell shorter of meeting its burden than did the prosecution in *Murphy*.

CONCLUSION

Defendant was in a delusional, psychotic manic state and could not understand the wrongfulness of her conduct when she failed to stop her vehicle for police officers. All the mental health experts testifying at trial, even the state's own forensic psychiatrist, opined that defendant was legally insane at the time she committed the offenses in this case. Their testimony was uncontradicted and was supported both by the lay testimony and circumstantial evidence.

The evidence that defendant was legally insane preponderates so heavily against the verdict that it would be a serious miscarriage of justice to permit it to stand.[43] The trial court abused its discretion by denying defendant's motion for a new trial. I agree with the Court of Appeals that defendant should have a new trial.



---

[42] *Id*. at 467-468.

[43] *People v Lemmon,* 456 Mich 625, 642 (1998).



CAVANAGH, J., would deny leave to appeal.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

November 6, 2009

Clerk